**ABORTION RIGHTS MOBILIZATION, INC., et al., Plaintiffs,**

v.

**James A. BAKER, III, Secretary of The Treasury, and Roscoe L. Egger, Jr., Commissioner of Internal Revenue, et al., Defendants.**

**No. 80 Civ. 5590 (RLC).**

United States District Court, S.D. New York.

May 8, 1986.

Marshall Beil, New York City, for plaintiffs; Florence Weiner, of counsel.

Williams & Connolly, Wilfred R. Caron, Gen. Counsel, U.S. Catholic Conference, Washington, D.C., Hughes Hubbard & Reed, New York City, for U.S. Catholic Conference and National Conference of Catholic Bishops; Charles H. Wilson and Richard S. Hoffman, Mark E. Chopko, Asst. Gen. Counsel, U.S. Catholic Conference, Washington, D.C., of counsel.

ROBERT L. CARTER, District Judge.

Plaintiffs, on March 19, 1986, renewed their motion for an order adjudging the United States Catholic Conference ("USCC") and the National Conference of Catholic Bishops ("NCCB") in civil contempt. In a letter dated March 6, 1986, counsel for the USCC/NCCB stated that the "USCC/NCCB have asked me to advise the Court that they cannot, in conscience, comply with the subpoenas in question." The USCC/NCCB are unquestionably in contempt; what is at issue is their *bona fides* during this protracted discovery dispute. Plaintiffs charge the USCC/NCCB with bad faith; the latter protest their good faith and respect for the court. In the court's view the USCC/NCCB have done more than simply exercise bad judgment; they have wilfully misled the court and the plaintiffs and have made a travesty of the court process.

The court assumes familiarity with the history of this case, which has already been the subject of three published opinions. *See Abortion Rights Mobilization, Inc. v. Regan,* 544 F.Supp. 471 (S.D.N.Y.1982)

("*ARM I*"); 552 F.Supp. 364 (S.D.N.Y. 1982) ("*ARM II*"); and 603 F.Supp. 970 (S.D.N.Y.1985) ("*ARM III*"). Nonetheless, a recital of that history will provide an illuminating context for the facts giving rise to the instant motion. Plaintiff individuals and organizations challenge enforcement of § 501(c)(3) of the Internal Revenue Code which provides tax exempt status to charitable and educational institutions. Plaintiffs challenge the tax-exempt status of the Roman Catholic Church. They assert that the Church's lobbying and political activities against abortion render the exemption unlawful under § 501(c)(3) of the Internal Revenue Code. They also argue that the exemption violates the First Amendment to the United States Constitution. The individual plaintiffs complain because they are unable to deduct from their income contributions that they make to organizations promoting abortion, whereas taxpayers who oppose abortion can make tax-deductible contributions to the USCC and NCCB. The organizational plaintiffs complain because they are denied tax-exempt status for advocating abortion, whereas the USCC/NCCB enjoys such status and is free to engage in anti-abortion activities.

In *ARM I*, the USCC/NCCB, originally named as defendants, were dismissed on the ground that plaintiffs had asserted no valid claim against them. The court held, however, that the plaintiffs could proceed against the Secretary of the Treasury and the Commissioner of Internal Revenue ("the government"). In addition, the court held that some, but not all, of the plaintiffs had standing to bring this action, and that the Anti-Injunction Act, 26 U.S.C. § 7421, did not bar the suit. The government then sought certification of the latter two determinations for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) and a stay of discovery. The USCC/NCCB joined in the government's certification motion and, as we noted at the time, "somewhat surprisingly, since they are no longer parties to the litigation," joined in the motion to stay discovery as well. *ARM II*, 552 F.Supp. at

366. Both motions were denied. *Id.*, at 367.

Plaintiffs served subpoenas on the USCC/NCCB as third parties in March, 1983. A motion to quash the subpoenas was made in April, 1983. Subsequently, the government moved for a stay pending decision by the United States Supreme Court in *Wright v. Regan*, subsequently decided *sub nom. Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). The court denied the motion because it was not as sanguine as defendants that any decision in *Wright* would alter the court's reasoning in *ARM I*. However, it suggested a schedule of discovery which would postpone the most costly discovery until the Supreme Court had spoken. Despite this ruling, the USCC/NCCB refused to produce any documents at all, and insisted that none be produced until *Wright* was decided.

After the Supreme Court decision in *Wright* the government again moved to dismiss for lack of standing. That motion was denied on March 27, 1985. *ARM III, supra*. The government, joined by the USCC/NCCB, again sought certification of an interlocutory appeal. That motion was denied on July 12, 1985, in an unpublished memorandum decision.

Plaintiffs had by this time reactivated their subpoenas addressed to the USCC/NCCB, which continued to refuse production. In June, 1985, the USCC/NCCB moved the court for a protective order.

On July 12, 1985, the very day on which the government's second § 1292 motion was denied, the USCC/NCCB performed the first act of the wasteful charade that is the subject of this opinion. On that day, the court held a conference with the parties and the USCC/NCCB concerning the subpoenas and the outstanding motion for a protective order.

At this point it is appropriate to point out that litigants are free to opt for a citation of contempt if that is the only available avenue to obtain review of what they consider incorrect determinations by a lower

court. Moreover, litigants may certainly take all steps to seek review short of contempt and resort to that step only as their last refuge. The court could not fault such behavior. If, at this July meeting, counsel had advised the court that the USCC/NCCB would continue to seek appellate review and that they had resolved to subject themselves to a contempt order should other means of appellate review fail, there would be no cause to complain today. But the USCC/NCCB did more than fail to be forthright with the court. They began to engage the court and the plaintiffs in a series of maneuvers that—given the USCC/NCCB's apparent intention of ultimate non-compliance—made a game of the judicial process.

At that July 12 meeting, the USCC/NCCB stated its concerns about infringement of their religious freedoms through enforcement of the subpoenas. In response, the court emphasized that it would not permit plaintiffs to engage in any broad-gauged incursion into the USCC/NCCB files, but would permit discovery only of matters demonstrably relevant to the issue before the court. The USCC/NCCB complained of wide publicity given to a document that the plaintiffs had previously received. The court censured that practice and barred plaintiffs from making public any discovery materials produced by the USCC/NCCB, since the court assumed that any documents obtained were sought solely for the purposes of litigation.

Sometime after that conference plaintiffs filed a motion for an order adjudging the USCC/NCCB in contempt because they still refused to comply with the subpoena. On September 4, 1985, the court, in an endorsement, spelled out which documents should be produced and which documents were shielded by the First Amendment. Some of the documents sought were already in the public realm, and there appeared to be no basis for withholding them. As to the religious freedom issue, the court found that documents listed in two paragraphs of the subpoena "are the only documents which could conceivably trench on First Amendment considerations," and held

that those documents need not be produced at the time. Plaintiffs were ordered to narrow their requests as to those items, and both sides were asked to present their views as to whether required production of these items, even as more narrowly and precisely defined, would nonetheless violate the First Amendment. The court found the remainder of the materials unprotected and held that there remained no justification for refusing to abide by the court's order. The court refused to hold respondents in contempt but advised plaintiffs that if the unprotected documents were not produced, the motion could be renewed.

No documents were produced. In October, 1985, plaintiffs renewed their motion for an order of contempt. On October 25, 1985, the court held yet another conference to discuss the plaintiffs' motion and respondents' request for a protective order. The court painstakingly reviewed the matter with counsel. At that time a mandamus petition, filed by the government and joined by respondents, was pending before the Court of Appeals. The parties were ordered to agree on a stipulation of confidentiality and to agree on which documents would be subject to the confidentiality order. All other issues that counsel for respondents raised were discussed and, counsel asserted, resolved.

In an order dated November 20, 1985, the court recorded what had been accomplished at the conference, supposedly resolving all objections to compliance with the subpoenas. The motion for contempt was denied, and compliance with the subpoenas was postponed until the Second Circuit's determination of the pending mandamus petition. With the exception of matters delineated in the order or new matters that might arise by virtue of the Second Circuit determination, further objections to plaintiffs' subpoenas were barred.

The Second Circuit denied the mandamus petition on January 14, 1986. The USCC/NCCB continued to defy the court order. Another motion for contempt was filed on February 6, 1986. The USCC/NCCB in opposition urged the court to wait for the outcome of a petition to the Second Circuit to rehear the case *en banc.*

On February 26, 1986, the court again denied plaintiffs' motion without prejudice and ordered compliance with the subpoenas on or before March 7, 1986, unless in the interim the Second Circuit granted the petition for rehearing. On March 3, 1986, the Second Circuit denied the petition and the March 6, 1986 letter quoted above followed.

All of these efforts to protect the USCC/NCCB's acknowledged interests are now shown to have been utterly, utterly futile. Had the court been told that the USCC/NCCB intended to seek appellate review by defying any subpoena, no matter how narrowly circumscribed, it could have stayed all action on the subpoenas until other avenues to bring the matter before the Second Circuit had been ventured. In the event that those avenues failed, the contempt order would have followed. We would be exactly where we are today, less the baggage of plaintiffs' assertions of bad faith and delay and the court's conclusion that plaintiffs' complaints are amply justified.

Respondents correctly note that the Second Circuit's refusal to grant the petition for mandamus gives no indication of its views as to the merits of the underlying issues. Yet precedent is such that denial was all but a certainty. Mandamus is, after all, an extraordinary writ. The most efficacious route to a review by the Court of Appeals under the circumstances was by review of an adjudication of respondents in contempt. The government had no basis for using a contempt adjudication to get an appeal before the Second Circuit. The USCC/NCCB did.[1] Counsel *must* have foreseen that such was their most likely recourse. Hence, I agree with plaintiffs that the USCC/NCCB's vigorous activities up to now—seeking protective orders, holding conferences with the court and plaintiffs to discuss and agree on matters which could be subject to confidentiality protection—have been a complete waste of time and energy. The result has been to stall and frustrate plaintiffs' efforts for an early resolution of their right to obtain discovery. For that reason, sanctions for each day's delay are appropriate.

The respondents concede that they are in contempt and the facts are not in dispute. Moreover, the respondents, from the first motion for contempt filed on June 20, 1985 until now have been accorded plentiful opportunities to be heard. Therefore, no formal hearing is now required. *Parker Pen Co. v. Greenglass*, 206 F.Supp. 796 (S.D.N.Y.1962) (Dawson, J.). Sanctions may be imposed. *Danielson v. United Seaworkers Smoked Fish & Cannery Union*, 405 F.Supp. 396, 403 (S.D.N.Y.1975) (Carter, J.); *MCA, Inc. v. Wilson*, 425 F.Supp. 457, 459 (S.D.N.Y.1977) (Cooper, J.). The USCC/NCCB are adjudged in contempt for refusing to comply with the February 26, 1986 order of the court. Beginning May 12, 1986, for each day that the USCC/NCCB continues to defy the court's order, each will be subject to a fine of $50,000 per day.

IT IS SO ORDERED.

---

**1.** Apparently, what the government and USCC/NCCB would like is appellate review of the merits of this court's rulings in *ARM I* and *ARM III* prior to any trial before this court. It is questionable whether appeal of the contempt order will get the merits of the controversy before the Court of Appeals. It will, however, put in issue the validity of the subpoenas and of the court's orders that the USCC/NCCB produce the requested documents.