885 F.2d 1020
 65 A.F.T.R.2d 90-430, 58 USLW 2150, 89-2
USTC P 9576
 In re UNITED STATES CATHOLIC CONFERENCE ("USCC") and
National Conference of Catholic Bishops ("NCCB"),
Appellants.
ABORTION RIGHTS MOBILIZATION INC., Lawrence Lader, Margaret
O. Strahl, M.D., Helen W. Edey, M.D., Ruth P. Smith,
National Womens Health Network, Inc., Long Island National
Organization For Women-Nassau, Inc., Rabbi Israel Margolies,
Reverend Bea Blair, Rabbi Balfour Brickner, Reverend Robert
Hare, Reverend Marvin G. Lutz, Womens Center for
Reproductive Health, Jennie Rose Lifrieri, Eileen Walsh,
Patricia Sullivan Luciano, Marcella Michalski, Chris
Niebrzydowski, Judith A. Seibel, Karen Decrow and Susan
Sherer, Plaintiffs-Appellees,
v.
James A. BAKER, III, Secretary of the Treasury, and Roscoe
L. Egger, Jr., Commissioner of Internal Revenue, Defendants.
 No. 1486, Docket 86-6092.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 5, 1988.
Decided Sept. 6, 1989.
Opinion on Denial of Rehearing
Oct. 4, 1989.
 
 Kevin T. Baine (Edward Bennett Williams, Charles H. Wilson, Richard S. Hoffman, Kevin J. Hasson, Williams & Connolly, Mark E. Chopko, Gen. Counsel, Phillip H. Harris, Sol., Washington, D.C., of counsel), for appellant U.S. Catholic Conference.
 Edward T. Ferguson, Asst. U.S. Atty., S.D.N.Y., for party-in-interest U.S.
 Marshall Beil (Mark W. Budwig, Dawn E. Johnsen, Gene B. Sperling, New York City, of counsel), for plaintiffs-appellees Abortion Rights Mobilization, Inc., et al.
 Steven R. Shapiro (John A. Powell, Helen Hershkoff, C. Edwin Baker, American Civil Liberties Union Foundation, Arthur N. Eisenberg, New York Civil Liberties Union, New York City, of counsel), filed a brief amicus curiae on behalf of The American Civil Liberties Union Foundation, New York Civil Liberties Union, National Organization for Women, Catholics for a Free Choice, and Nat. Emergency Civil Liberties Committee in support of respondents.
 Before NEWMAN, KEARSE and CARDAMONE, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 This appeal is before us for a second time. The Supreme Court has remanded the matter for a determination of whether the United States District Court for the Southern District of New York (Carter, J.) had subject matter jurisdiction over the instant lawsuit that challenged the tax-exempt status of the Roman Catholic Church in the United States. The specific issue is whether the plaintiffs, who initiated this litigation to force the government to revoke the Catholic Church's tax-exempt status, satisfy the standing requirements of Article III. For the reasons discussed below, we hold that they do not.
 
 I BACKGROUND
 A. The Plaintiffs
 
 2
 Plaintiffs in this appeal are united in their commitment to a woman's right to obtain a legal abortion. This suit was instituted originally by 20 individuals and nine organizations. We assume familiarity with their specific identities as set forth in the district court's opinion. See Abortion Rights Mobilization, Inc. v. Regan, 544 F.Supp. 471, 474 (S.D.N.Y.1982). Some are no longer parties. Of the nine original organizational plaintiffs, for example, the district court held that five abortion clinics lacked standing and dismissed their complaints. Id. at 479 nn. 5 & 6. The district court did grant standing to an organization called the Women's Center for Reproductive Health, because it is run by a Presbyterian minister who is also a plaintiff. We discuss the Women's Center with the clergy plaintiffs. The three remaining organizations are Abortions Rights Mobilization Inc. (ARM), the National Women's Health Network Inc. (NWHN) and the Long Island National Organization For Women-Nassau, Inc. (Nassau-NOW). The former two are pro-choice organizations that are non-profit, tax-exempt organizations as defined in Sec. 501(c)(3) of the Internal Revenue Code (Code). 26 U.S.C. Sec. 501(c)(3). Nassau-NOW shares ARM's and NWHN's objectives, but is exempt from taxes under Sec. 501(c)(4), rather than (c)(3).
 
 
 3
 Twenty individual plaintiffs also bring this suit. They include Protestant ministers and Jewish rabbis. In contrast to the views of the Catholic Church, they believe that abortion is morally permissible under some circumstances. Many of the individual plaintiffs donate money to or serve as directors of the organizational plaintiffs. The individual plaintiffs vote and pay taxes.
 
 B. Pertinent Statutory Framework
 
 4
 Before reciting the history of the prior legal proceedings, an understanding of two pertinent sections of the Code is necessary, as a preliminary matter, to appreciate what is at stake in this litigation. As noted, the Catholic Church and organizational plaintiffs ARM and NWHN are tax-exempt under Sec. 501(c)(3). That section states that qualifying religious or civic public interest organizations need not pay federal taxes. The trade-off for the benefit of this exemption is that no substantial part of the organization's activities may include "carrying on ... propaganda, or otherwise attempting, to influence legislation ... [nor may it] participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office." Thus, the quid pro quo for Sec. 501(c)(3) tax-exemption is a restraint on an organization's right to try to influence the political process. This limitation has been held constitutional. See Regan v. Taxation With Representation of Washington, 461 U.S. 540, 544, 103 S.Ct. 1997, 2000, 76 L.Ed.2d 129 (1983) (TWR ). Section 501(c)(3) status is advantageous to the supporters of an organization as well as the organization itself because Sec. 170 of the Code permits donors to Sec. 501(c)(3) entities to claim a deduction for their contributions. This deduction gives the donor an economic incentive to contribute. For example, a donor in a 28 percent tax bracket actually pays only 72 cents for every dollar contributed to the Catholic Church because of the deduction. Consequently, organizations like the Church and plaintiffs ARM and NWHN have enhanced fundraising abilities because they are able to offer donors the lure of the Sec. 170 deduction. See 461 U.S. at 546, 103 S.Ct. at 2001.
 
 C. The Dispute
 
 5
 The plaintiffs object to the Internal Revenue Service's (IRS) enforcement--or, as they describe it, nonenforcement--of Sec. 501(c)(3)'s prohibition on lobbying and campaigning. Because this appeal arises from a motion to dismiss for want of standing, we must accept all of the plaintiffs' allegations as true and draw all inferences in their favor. See Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).
 
 
 6
 Plaintiffs first allege that the Catholic Church is repeatedly violating Sec. 501(c)(3)'s prohibition on campaigning in order to promote the tenet that abortion is immoral and should therefore be made unlawful. For instance, plaintiffs point to the Church's "Pastoral Plan for Pro-Life Activities", which they claim is an organized effort to mobilize the entire Church in a "three-fold educational, pastoral and political effort to outlaw abortions in the United States." Complaint, p 22. The complaint also alleges that through its priests and officials, the Catholic Church has endorsed or supported pro-life political candidates and opposed pro-choice candidates by publishing articles in its bulletins, attacking or endorsing candidates from the pulpit, distributing partisan letters to parishioners, and urging its members to donate to and sign petitions of "right to life" committees and candidates. Complaint, p 26. Similarly, plaintiffs contend that the Church has contributed substantial sums of money to "right to life" and other political groups which have, directly or indirectly, supported the political candidacies for public office of persons favoring anti-abortion legislation. Complaint, p 27.
 
 
 7
 Plaintiffs' other major contention is that the IRS knows about the Catholic Church's alleged political activities and has ignored these activities rather than either revoking the Church's tax-exempt status under Sec. 501(c)(3), or not renewing the Church's annual exemption. They therefore assert that the government has "exempted the Roman Catholic Church from the strictures of the law and from the government's enforcement efforts," Complaint, p 33, and that the IRS treats the Catholic Church more favorably than those organizations that are pro-choice. Yet plaintiffs do not allege that the IRS has penalized them for violating the Code; in fact, they assert that they have not violated Sec. 501(c)(3) by electioneering, and do not intend to. Rather, they want the government to enforce the strictures of Sec. 501(c)(3) against the Catholic Church. Thus, plaintiffs do not complain about their own tax status--their challenge is directed solely against the Catholic Church's exemption.
 
 
 8
 The complaint and affidavits also spell out the asserted harms plaintiffs suffer as a result of the Church's and the IRS' acts. Because the nature of the claimed harm is an integral component in standing analysis, it will be fully analyzed in the later discussion of standing.
 
 D. Prior Proceedings
 
 9
 In the amended complaint of January 30, 1981 the plaintiffs sued then-Secretary of the Treasury Donald T. Regan, then-Commissioner of Internal Revenue Roscoe L. Egger, Jr., the United States Catholic Conference, Inc., and the National Conference of Catholic Bishops (the latter two collectively the Catholic Church or the Church). The Catholic Church is composed of approximately 30,000 parishes, schools and other entities in the United States whose tax-exemption is granted collectively in a group ruling. The plaintiffs sought declarations that the defendants had violated both Sec. 501(c)(3) of the Code and the Establishment Clause of the First Amendment to the United States Constitution. They also sought injunctive relief to compel the government to enforce the Code and Constitution by revoking the Church's group tax-exemption, to collect the resulting back taxes, and to notify contributors to the Catholic Church that they may no longer claim their donations as deductions on their income tax returns.
 
 
 10
 The defendants moved to dismiss the complaint on several grounds, including standing. In 1982 the district court held that the clergy and voter plaintiffs had standing, see Abortion Rights Mobilization, Inc. v. Regan, 544 F.Supp. at 491 (S.D.N.Y.1982) (ARM I ), and three years later--following a rehearing to consider the impact of the Supreme Court's subsequent decision in Allen v. Wright, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)--reiterated this holding. See Abortion Rights Mobilization, Inc. v. Regan, 603 F.Supp. 970 (S.D.N.Y.1985) (ARM II ). The defendant Catholic Church's motion to dismiss it as a defendant in the suit was granted. See ARM I, 544 F.Supp. at 487. As the litigation progressed, plaintiffs requested substantial discovery from the Church as a non-party witness. Upon its refusal to comply, the Catholic Church was held in contempt in May, 1986. See 110 F.R.D. 337 (S.D.N.Y.1986).
 
 
 11
 On appeal, the Church argued that it was improperly held in contempt in the action because the district court lacked subject matter jurisdiction over the case before it due to plaintiffs' lack of standing. We held that, as a non-party contemnor, the Church itself lacked standing to challenge plaintiffs' standing in the main suit, and that as a non-party witness it could only challenge a contempt finding when the district court was without even colorable jurisdiction. Hence, we had no occasion to reach the underlying question now before us of plaintiffs' standing. See In re United States Catholic Conference, 824 F.2d 156 (2d Cir.1987). The Supreme Court reversed, holding that a non-party witness held in contempt had standing to challenge the district court's subject matter jurisdiction. United States Catholic Conference v. Abortion Rights Mobilization, Inc., 487 U.S. 72, 108 S.Ct. 2268, 101 L.Ed.2d 69 (1988). Upon remand from the Supreme Court, we now must analyze whether plaintiffs have standing to sue the government for conferring tax-exempt status to the Catholic Church.
 
 II DISCUSSION
 A. Standing Analysis
 
 12
 In Allen v. Wright, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), the Supreme Court made clear that standing is not merely a prudential inquiry into whether a court should exercise jurisdiction, but is rooted in Article III's "case" or "controversy" requirement and reflects separation of powers principles. See also Valley Forge Christian College v. Americans United For Separation of Church and State, Inc., 454 U.S. 464, 471, 102 S.Ct. 752, 757-58, 70 L.Ed.2d 700 (1982). Thus, when a plaintiff lacks standing to bring suit, a court has no subject matter jurisdiction over the case. Deceptively simple to state, standing entails a complex three-pronged inquiry. First, plaintiffs must show that they have suffered an injury in fact that is both concrete in nature and particularized to them. Allen v. Wright, 468 U.S. at 755, 104 S.Ct. at 3326-27; Valley Forge, 454 U.S. at 482-87, 102 S.Ct. at 763-66; Warth v. Seldin, 422 U.S. at 502, 95 S.Ct. at 2207; Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). Second, the injury must be fairly traceable to defendants' conduct. See Allen, 468 U.S. at 757, 104 S.Ct. at 3327-3328; Valley Forge, 454 U.S. at 472, 102 S.Ct. at 758; Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 41-42, 96 S.Ct. 1917, 1925-26, 48 L.Ed.2d 450 (1976) (EKWRO ); Warth, 422 U.S. at 504-05, 95 S.Ct. at 2208; Linda R.S. v. Richard D., 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). Third, the injury must be redressable by removal of defendants' conduct. See Allen, 468 U.S. at 758-59, 104 S.Ct. at 3328-29; EKWRO, 426 U.S. at 41-42, 96 S.Ct. at 1925-26; Warth, 422 U.S. at 504-05, 95 S.Ct. at 2208; Linda R.S., 410 U.S. at 617, 93 S.Ct. at 1148. The second and third prongs--traceability and redressability--often dovetail; essentially, both seek a causal nexus between the plaintiff's injury and the defendant's assertedly unlawful act. To establish standing, a plaintiff must plead all three elements.
 
 B. Application to This Case
 
 13
 Standing in the case at hand is alleged under a number of theories that require a general overview in order to match the category of plaintiff to the asserted basis for standing. The prior proceedings have distilled standing theories that view plaintiffs as clergy, voters, and taxpayers. We first address those theories relied upon by the district court in finding that plaintiffs had standing, and then consider a fourth theory--competitive advocate standing--not explicitly addressed below.
 
 1. Clergy Standing
 
 14
 Clergy plaintiffs claim standing under the Establishment Clause of the First Amendment. That clause provides: "Congress shall make no law respecting an establishment of religion...." The amended complaint alleges that
 
 
 15
 The failure of the government defendants to apply the Code equally to the ... Church is in effect a subsidy of the Church's efforts to further its religious aims in the political sphere, a subsidy not granted to law-abiding ... plaintiffs, who hold contrary religious beliefs. This constitutes an unconstitutional establishment of religion.
 
 
 16
 Complaint, p 43. Without reaching the merits, the district court held that the clergy plaintiffs and the religiously affiliated Women's Center for Reproductive Health (collectively clergy plaintiffs) had standing under the Establishment Clause because they were "denigrated by government favoritism to a different theology." See ARM I, 544 F.Supp. at 479. Thus, it concluded that the IRS "hampers and frustrates these plaintiffs' ministries." Id. at 480. The appropriateness of this holding turns on whether the stigma plaintiffs allege is a cognizable injury in fact. We think the district court erred by translating plaintiffs' genuine motivation to sue into a personalized injury in fact.
 
 
 17
 It is true that an injury claimed to derive from a violation of the Establishment Clause can be spiritual in nature. See Valley Forge, 454 U.S. at 486-87 n. 22, 102 S.Ct. at 766 n. 22 (citing School Dist. of Abington v. Schempp, 374 U.S. 203, 224 n. 9, 83 S.Ct. 1560, 1572 n. 9, 10 L.Ed.2d 844 (1963)); Association of Data Processing Serv. Orgs. Inc. v. Camp, 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970) (Data Processing ). Nonetheless, the injury must be particularized to the individuals who sue. See Valley Forge, 454 U.S. at 486-87 n. 22, 102 S.Ct. at 766 n. 22 (suggesting that plaintiffs must have been " 'directly affected by the ... practices against which their complaints are directed.' " (quoting Schempp, 374 U.S. at 224 n. 9, 83 S.Ct. at 1572 n. 9)). The Establishment Clause does not exempt clergy or lay persons from Article III's standing requirements. See Valley Forge, 454 U.S. at 489, 102 S.Ct. at 767. Here, the clergy plaintiffs have not been injured in a sufficiently personal way to distinguish themselves from other citizens who are generally aggrieved by a claimed constitutional violation. For that reason, they lack standing.
 
 
 18
 Both Valley Forge and Allen v. Wright support this conclusion. In Valley Forge, an organization dedicated to ensuring separation of church and state sued the Secretary of Health, Education and Welfare for conveying, without consideration, surplus government property to a religiously affiliated college. The Valley Forge plaintiffs made the same argument as the instant clergy plaintiffs--that by conferring a benefit to a third party that was a religious entity, the government had violated the Establishment Clause. The Supreme Court considered whether plaintiffs had been injured as taxpayers--a subject we address below--and as "separationists" bent on policing the Establishment Clause. 454 U.S. at 482, 102 S.Ct. at 764. Accepting the sincerity of plaintiffs' ire at the alleged violation of the Establishment Clause, it held that such distress was not cognizable unless plaintiffs could "identify any personal injury suffered by them as a consequence of the alleged constitutional error...." Id. at 485, 102 S.Ct. at 765 (emphasis in original). It was not enough to point to an assertedly illegal benefit flowing to a third party that happened to be a religious entity. Absent a particularized injury, plaintiffs could not maintain suit.
 
 
 19
 In Allen v. Wright, the plaintiffs were parents of black children who attended public schools. They sued the IRS, asserting that it was duty-bound to deny tax-exempt status to racially discriminatory private schools, and its failure to do so impaired desegregation of the public school system. See 468 U.S. at 739-40, 104 S.Ct. at 3318-19. In Allen v. Wright, as here, plaintiffs' complaint centered on the tax-exempt status of a third party. The parents asserted two injuries, only one of which is pertinent to this case--harm from the fact that the government was giving financial assistance to private discriminatory schools. Id. at 752-53, 104 S.Ct. at 3325. The Supreme Court held that the parents did not have standing and made several points on the injury in fact requirement.[1] See 468 U.S. at 756-57, 104 S.Ct. at 3327-28. Relying on Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974) (Reservists ), the Court stated that "an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." Allen v. Wright, 468 U.S. at 754, 104 S.Ct. at 3326. Parents did not derive standing by claiming "stigmatizing injury" caused by racial discrimination because "such injury accords a basis for standing only to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct." 468 U.S. at 755, 104 S.Ct. at 3326 (quoting Heckler v. Mathews, 465 U.S. 728, 739-40, 104 S.Ct. 1387, 1395, 79 L.Ed.2d 646 (1984)) (emphasis added). The Supreme Court then emphasized that when the injury asserted is an "abstract stigmatic injury," the requirement that a plaintiff be personally injured takes on heightened importance. See 468 U.S. at 755-56, 104 S.Ct. at 3327.
 
 
 20
 The clergy plaintiffs' complaint in the instant case suffers from the same defects as the parents' complaint in Allen v. Wright and the separationists' complaint in Valley Forge: The primary injury of which they complain is their discomfiture at watching the government allegedly fail to enforce the law with respect to a third party. As in Valley Forge, the instant plaintiffs state that defendants have violated their "sincere and deeply held belief in the separation of church and state." See, e.g., Affidavit of plaintiff Rev. Beatrice Blair. Complaint, p 7. This injury can hardly be called personalized to the clergy plaintiffs. They can point to no illegal government conduct directly affecting their own ministries. Thus, the injury the clergy complain of could be asserted by any member of the public who disagrees with the views of the Catholic Church and the IRS in granting it a tax exemption. See Allen v. Wright, 468 U.S. at 755, 104 S.Ct. at 3326-27.
 
 
 21
 Similarly, because the clergy have neither been personally denied equal treatment under the law nor in any way prosecuted by the IRS, their self-perceived "stigma" does not amount to a particularized injury in fact. See id. To hold the clergy plaintiffs' injury cognizable would turn the federal court into " 'a forum in which to air ... generalized grievances about the conduct of government.' " Valley Forge, 454 U.S. at 483, 102 S.Ct. at 764 (quoting Flast v. Cohen, 392 U.S. 83, 106, 88 S.Ct. 1942, 1955-56, 20 L.Ed.2d 947 (1968)). Hence, the clergy's complaint collapses into that of an offended bystander, insufficient to meet Article III's standing requirements. A mere "claim that the Government has violated the Establishment Clause does not provide [plaintiffs] a special license to roam the country in search of governmental wrongdoing and to reveal their discoveries in federal court." Valley Forge, 454 U.S. at 487, 102 S.Ct. at 766.
 
 
 22
 This analysis is unchanged by the fact that the plaintiffs in this case are clergy. To rebut the argument that they have not suffered a particularized injury, these plaintiffs contend that what distinguishes them from the ordinary member of the public who takes issue with the Church and IRS is that they are members of the clergy. In our view, the holding in Valley Forge and its progeny would have been the same even had those plaintiffs been members of the clergy rather than Americans United For Separation of Church and State because "standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy." Id. at 486, 102 S.Ct. at 766.
 
 
 23
 Moreover, granting standing to clergy qua clergy raises several troubling issues. Granting standing to the instant ministers and rabbis on the basis that they were directly and personally injured by the IRS' actions solely on account of their stature within their churches and synagogues would require us to give greater credence to the clergy's beliefs with the beliefs of their parishioners. Thus, to hold that a religious leader is more qualified to bring an Article III "case" or "controversy" than a member of his congregation seemingly entails an impermissible invasion into a church's or a synagogue's internal hierarchy and its autonomy. See Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 450, 89 S.Ct. 601, 606-07, 21 L.Ed.2d 658 (1969) (holding that in church property dispute, the First Amendment prohibits civil courts from passing on questions of religious doctrine). And, as the district court correctly noted, the Establishment Clause protects religions from secular interference. See ARM I, 544 F.Supp. at 479 n. 5; see also Engel v. Vitale, 370 U.S. 421, 432, 82 S.Ct. 1261, 1267-68, 8 L.Ed.2d 601 (1962) (stating that religion is "too personal, too sacred, too holy, to permit its 'unhallowed perversion' by a civil magistrate").
 
 
 24
 Second, granting standing to enforce the Establishment Clause to clergy qua clergy might itself violate the same clause by constituting governmental favoritism of religion over non-religion. See Texas Monthly v. Bullock, --- U.S. ----, 109 S.Ct. 890, 899-900, 103 L.Ed.2d 1 (1989); Abington, 374 U.S. at 216, 83 S.Ct. at 1568. The Supreme Court has made clear that the Establishment Clause prohibits not only government endorsement of a given sect, but also forbids the government from generally favoring religion over secularism. See Everson v. Board of Educ., 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947). Thus, the strength, intensity, or knowledge of one's religious beliefs obviously is not a criterion upon which to confer standing because such a rule would deny to non-believers the same benefits of maintaining suit. See McDaniel v. Paty, 435 U.S. 618, 639, 98 S.Ct. 1322, 1334-35, 55 L.Ed.2d 593 (1978) (Brennan, J., concurring) (except when required by the Free Exercise Clause, "government may not use religion as a basis of classification for the imposition of duties, penalties, privileges or benefits."). As Thomas Jefferson stated in his much quoted metaphor, the Establishment Clause was designed to build "a wall of separation between church and State." Reynolds v. United States, 98 U.S. 145, 164, 25 L.Ed. 244 (1878); see also Everson, 330 U.S. at 16, 67 S.Ct. at 511-12. Plaintiffs point to no authority for a standing doctrine exception to this principle of separation between church and state. To read plaintiffs' complaint as stating a particularized injury simply because it is dressed in clerical garb would only weaken the foundation of Jefferson's metaphorical wall. As a consequence, stripped of the assertedly unique status of clergy, plaintiffs' injury is as generalized as that asserted in Valley Forge and Allen v. Wright, and their complaint must be similarly dismissed.
 
 2. Taxpayer Standing
 
 25
 The taxpayer plaintiffs allege that they are "harmed because the government's subsidy of the ... Church's illegal political activities is the equivalent of a government expenditure to establish a religion in violation of the First Amendment to the Constitution." Complaint, p 48(a). In essence, they complain that not only is the government making illegal use of tax revenue, but also that they, as taxpayers, are forced to contribute to the government's asserted subsidy of the Catholic Church.
 
 
 26
 We set forth briefly the requirements for taxpayer standing, which are somewhat more specific than those for standing generally. The basic rule is that taxpayers do not have standing to challenge how the federal government spends tax revenue. See Frothingham v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923). In Flast v. Cohen, the Supreme Court created an exception to the Frothingham rule, holding that taxpayer standing is available to challenge Establishment Clause violations when the allegedly unconstitutional action was authorized by Congress under the taxing and spending clause of Art. I, Sec. 8. See 392 U.S. at 102-06, 88 S.Ct. at 1953-56. Subsequent cases made clear the narrowness of Flast's exception to Frothingham's rule against taxpayer standing. See Reservists, 418 U.S. at 227-28, 94 S.Ct. at 2935; United States v. Richardson, 418 U.S. 166, 175-76, 94 S.Ct. 2940, 2945-46, 41 L.Ed.2d 678 (1974).
 
 
 27
 Then Valley Forge--handed down in the interim between the filing of the instant complaint and the motion to dismiss--caused some commentators to conclude that the taxpayer standing theory was virtually a dead letter. See, e.g., Note: Analyzing Taxpayer Standing in Terms of General Standing Principles: The Road Not Taken, 63 B.U.L.Rev. 717 (1983). Hence, plaintiffs abandoned this theory in the district court. See ARM I, 544 F.Supp. at 476 n. 1. Following the Supreme Court's more recent decision in Bowen v. Kendrick, --- U.S. ----, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988) (holding that taxpayers had standing to challenge the application of the Adolescent Family Life Act (AFLA)), plaintiffs renew before us their taxpayer standing arguments. In light of the protracted history of this litigation, it is appropriate to consider this issue now, if for no other reason than to prevent a third appeal.
 
 
 28
 The Supreme Court in Kendrick distinguished Valley Forge by emphasizing that in the latter case the decision by the executive agency to dispose of the surplus federal property--though made pursuant to a federal statute--was not a challenge to Congress' taxing and spending power because the statute's mandate derived from the property clause of Art. IV, Sec. 3. See 108 S.Ct. at 2579. In so doing, the Supreme Court clarified that taxpayer standing exists to challenge the executive branch's administration of a taxing and spending statute; the challenge need not be directed exclusively at Congress. See id. But Kendrick's discussion of Valley Forge does not breathe new life into plaintiff's moribund taxpayer standing theory, as shall become evident.
 
 
 29
 In Kendrick, it was Congress that decided how the AFLA funds were to be spent, and the executive branch, in administering the statute, was merely carrying out Congress' scheme. See id. at 2580 ("[A]ppellees' claims call into question how the funds authorized by Congress are being disbursed pursuant to the AFLA's statutory mandate."). Thus, the Supreme Court held that taxpayers had standing to challenge whether Congress' decision under the taxing and spending clause had violated the limits imposed by the Establishment Clause.
 
 
 30
 Plaintiffs in the instant case do not challenge Congress' exercise of its taxing and spending power as embodied in Sec. 501(c)(3) of the Code; they do not contend that the Code favors the Church. The Supreme Court, as noted, has already upheld the constitutionality of that section. See TWR, 461 U.S. at 544, 103 S.Ct. at 2000. Instead, they argue that the IRS, in allegedly closing its eyes to violations by the Church, is disregarding the Code's mandate and the Constitution. The complaint centers on an alleged decision made solely by the executive branch that in plaintiffs' view directly contravenes Congress' aim. The instant case is therefore distinguishable from Kendrick. In that case, there was "a sufficient nexus between the taxpayer's standing as a taxpayer and the congressional exercise of taxing and spending power, notwithstanding the role the Secretary plays in administering the statute." Kendrick, 108 S.Ct. at 2580. Here, there is no nexus between plaintiffs' allegations and Congress' exercise of its taxing and spending power. Hence, Kendrick does not alter the requirements of taxpayer standing to allow the instant plaintiffs to challenge how the IRS administers the Code. Consequently, plaintiffs fall within Frothingham's general rule denying taxpayer standing. See 262 U.S. at 488, 43 S.Ct. at 601.
 
 3. Voter Standing
 
 31
 The voter plaintiffs allege that they are injured because the IRS' refusal to revoke the Catholic Church's tax-exempt status "impairs and diminishes plaintiffs' right to vote." Complaint, p 48(b). When it granted plaintiffs' "voter standing," the district court relied on Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). See ARM I, 544 F.Supp. at 480. The district court's appellation of this theory as "voter standing" as applied to this case is a misnomer; plaintiffs' asserted basis for standing has nothing to do with voting. In Baker v. Carr, the Supreme Court held that disadvantaged voters had standing to challenge Tennessee's apportionment plan. Id. 369 U.S. at 206, 82 S.Ct. at 704. The wrong that plaintiffs sought to vindicate in Baker v. Carr and in those cases that construed it was the dilution of their vote relative to the vote of other citizens of the same state--a direct, cognizable injury. See, e.g., Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); see also, Heckler v. Mathews, 465 U.S. at 738 n. 4, 104 S.Ct. at 1394 n. 13; Reservists, 418 U.S. at 223 n. 13, 94 S.Ct. at 2933 n. 13 (construing Baker v. Carr ).
 
 
 32
 The Supreme Court has also held that disadvantaged voters may challenge an apportionment plan that is gerrymandered, that is, a plan whose voting district lines are drawn to reduce or eliminate the voting leverage of a given group of voters. See, e.g., Davis v. Bandemer, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986). It is undisputed that the instant plaintiffs do not allege that their vote has been diluted or that voting district lines have been gerrymandered to favor the Church or that anyone has "stuffed the ballot box" with votes for Church-backed candidates or that anyone has been prevented from voting. In short, plaintiffs here do not allege the particularized and objectively ascertainable injury in fact that sustained standing in the malapportionment cases. We therefore hold that Baker v. Carr and its progeny are inapposite and provide no basis for granting voter standing to these plaintiffs.
 
 4. Competitive Advocate Standing
 
 33
 We consider finally whether the plaintiffs may have standing under a theory that the district court did not explicitly consider, yet which derives from its discussion of "voter standing." This theory may be labeled as "Competitive Advocate Standing." It is addressed separately from voter standing for analytical clarity and because it presents a closer question.
 
 
 34
 Plaintiffs allege that they are injured "by the unequal enforcement of the Code by [the government] ... which constitutes an illegal, unfair and unconstitutional distortion of the political process by the government...." Complaint, p 48(b). They argue that their chance of electoral success is diminished because they do not receive the advantage that the Church receives from the government's asserted non-enforcement of the Code: The ability to campaign without losing tax-exemption under Sec. 501(c)(3), and the ability nonetheless to offer their contributors a tax deduction for donating. "In the inherently competitive political arena an advantage granted to one competitor automatically constitutes a hardship to the others." Complaint, p 41. The essence of this charge is that the IRS' non-enforcement of the Code creates an uneven playing field, tilted to favor the Catholic Church. See ARM II, 603 F.Supp. at 974 ("The injury alleged in ARM is unequal footing in the political arena...."). The fatal flaw in the argument is that plaintiffs are not players in that arena or on that field.
 
 
 35
 The Supreme Court has found cognizable injuries to economic competitors. See Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 403, 107 S.Ct. 750, 759, 93 L.Ed.2d 757 (1987); Investment Co. Inst. v. Camp, 401 U.S. 617, 620, 91 S.Ct. 1091, 1093-94, 28 L.Ed.2d 367 (1971); Arnold Tours, Inc. v. Camp, 400 U.S. 45, 46, 91 S.Ct. 158, 159, 27 L.Ed.2d 179 (1970) (per curiam); Data Processing, 397 U.S. at 151, 90 S.Ct. at 829. Implicit in the reasoning of those opinions is a requirement that in order to establish an injury as a competitor a plaintiff must show that he personally competes in the same arena with the party to whom the government has bestowed the assertedly illegal benefit. Only then does the plaintiff satisfy the rule that he was personally disadvantaged. See Allen v. Wright, 468 U.S. at 755-56, 104 S.Ct. at 3327; Heckler v. Mathews, 465 U.S. at 739-40, 104 S.Ct. at 1935; Valley Forge, 464 U.S. at 485, 102 S.Ct. at 765.
 
 
 36
 The economic competitor cases arose as banks diversified their functions, moved into new business areas, and became competitors of firms that had traditionally provided those services into which the banks sought to expand. The Supreme Court held that the organizations from which the banks sought to take away business--that is, with whom they sought to compete--had standing to challenge the banks' expansion into non-banking functions. See Clarke, 479 U.S. at 403, 107 S.Ct. at 759 (granting standing to trade association composed of securities brokers, dealers and underwriters to challenge governmental ruling that banks could act as discount brokers); Investment Co. Inst., 401 U.S. at 620, 91 S.Ct. at 1093-94 (granting standing to open end investment companies to challenge ruling that allowed bank entry into the field of collective investment funds); Arnold Tours, 400 U.S. at 46, 91 S.Ct. at 159 (holding travel agents had standing to challenge ruling to permit banks to offer travel services); Data Processing, 397 U.S. at 151, 90 S.Ct. at 829 (allowing data processors to challenge banks' foray into data processing); see also Texas Monthly v. Bullock, 109 S.Ct. at 896 (granting standing to secular magazine to challenge statutory tax-exemption of religious magazines).
 
 
 37
 In each of these cases the banks obtained governmental rulings allowing them to compete on the same "playing field" as the plaintiffs. The results would have been different had the travel agents, for example, sought to complain about the bank's incursion into the data processing business. Cf. United States v. Richardson, 418 U.S. at 176 n. 9, 94 S.Ct. at 2946 n. 9 (stating that Data Processing "recognized standing for those private business proprietors who were engaged in selling the same kind of services the Comptroller allowed banks to sell....") (emphasis added). It is equally inappropriate to allow the present plaintiffs to challenge the IRS' treatment of the Church, since by their own admission they choose not to match the Church's alleged electioneering with their own. Therefore, they are not competitors.[2]
 
 
 38
 Although the foregoing cases conferred standing to economic competitors, political competitors arguably should fare as well. Concededly, the Data Processing line of cases might extend to harms less concrete than diminution of profits. See Data Processing, 397 U.S. at 149, 90 S.Ct. at 827 (stating that standing may stem from non-economic values). Plaintiffs' allegations of a political system biased against them by illegal government conduct are troubling. But, just as the Supreme Court has refused to recognize an Establishment Clause exception to standing doctrine, so must the requirements of Article III be applied with equal rigor to cases concerning participation in the political process. Cf. Davis v. Bandemer, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) (standing analysis applies to asserted "political gerrymandering"); Baker, 369 U.S. 186, 82 S.Ct. 691 (malapportionment). There is "no principled basis on which to create a hierarchy of constitutional values or a complementary 'sliding scale' of standing which might permit respondents to invoke the judicial power of the United States." See Valley Forge, 454 U.S. at 484, 102 S.Ct. at 765; see also Reservists, 418 U.S. at 207-08, 94 S.Ct. at 2925 (rejecting standing for plaintiffs to challenge the independence of Congress on the grounds that because all citizens can claim injury from a Congress that violated the Incompatibility Clause, the injury was too generalized to be cognizable).
 
 
 39
 Like the claims of the clergy plaintiffs, the instant competitor claims lack particularized injury in fact. See Allen v. Wright, 468 U.S. at 755, 104 S.Ct. at 3326-3327; Valley Forge, 454 U.S. at 482-87, 102 S.Ct. at 763-66; Warth v. Seldin, 422 U.S. at 502, 95 S.Ct. at 2207. By asserting that an advantage to one competitor adversely handicaps the others, plaintiffs have not pleaded that they were personally denied equal treatment. See Allen v. Wright, 468 U.S. at 755-56, 104 S.Ct. at 3327; Heckler v. Mathews, 465 U.S. at 739-40, 104 S.Ct. at 1395; Valley Forge, 464 U.S. at 485, 102 S.Ct. at 765. They concede their tax status was correctly assessed by the IRS. Moreover, the complaint indicates that no plaintiff is currently a political candidate for public office. Plainly, the whole point of this lawsuit is plaintiffs' contention that it is illegal for the Catholic Church as a Sec. 501(c)(3) recipient to participate actively in the political process. And, recognizing that potential illegality and the value of their own exemptions under Secs. 501(c)(3) and (c)(4), plaintiffs state that they have refused to engage in electioneering to counter the Church's pro-life stance. Partly as a result of this self-imposed restraint, plaintiffs chose not to compete.
 
 
 40
 It may be argued that to qualify as competitor advocates plaintiffs need not go so far as to run for office or lobby; rather, they may simply advocate the pro-choice cause and stop short of supporting candidates. But that argument fails to answer the nagging question of why these individuals and organizations are then the appropriate parties to call a halt to the alleged wrongdoing. It is obvious that plaintiffs express their pro-choice views strongly and articulately. Yet such strongly held beliefs are not a substitute for injury in fact. See Valley Forge, 454 U.S. at 486, 102 S.Ct. at 766; Reservists, 418 U.S. at 225-26, 94 S.Ct. at 2934 (stating that "motivation is not a substitute for the actual injury needed"); Richardson, 418 U.S. at 177, 94 S.Ct. at 2946-47; Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972).
 
 
 41
 A further problem with recognizing a competitor advocate theory of standing in the present case is that it would be difficult to deny standing to any person who simply expressed an opinion contrary to that of the Catholic Church. Affording standing on that basis would lack a limiting principle, and would effectively give standing to any spectator who supported a given side in public political debate. Cf. J.H. Ely, Democracy and Distrust 103 (1980) (courts should intervene when the playing field is tilted, not when they think the wrong side has scored). This is precisely the problem the Supreme Court addressed in Valley Forge when it denied standing to plaintiffs who sued as taxpayers and citizens. We think that result would have been the same even had they called themselves "competitor advocates"--as proponents of a theory of the Establishment Clause different than that held by the government or the college that received the government benefit.
 
 
 42
 A similar theory was also initially raised in Reservists, where the plaintiffs sued as taxpayers, citizens, reservists and as opponents to the Vietnam War who sought to promote their viewpoint through lawful means. The district court found citizen standing. But "opponent standing" was too much, even for a court that thought the concept of standing had "been almost completely abandoned." Reservist Comm. To Stop The War v. Laird, 323 F.Supp. 833, 839 (D.D.C.1971), aff'd, 495 F.2d 1075 (D.C.Cir.1972), rev'd, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). Plaintiffs then withdrew the theory, and the Supreme Court therefore did not have an opportunity to address it when it ruled that the reservists did not have standing as citizens or taxpayers. 418 U.S. at 216, 94 S.Ct. at 2929.
 
 
 43
 We do not foreclose the possibility that political competitors may state a cognizable injury; instead, we simply hold that the theory cannot be sustained here. Putting out into the stormy sea of this litigation, it is prudent to closely hug the shores of the pleaded facts and established law, and not venture out any further than we must. As a consequence, because we hold that plaintiffs have not pleaded a direct injury in fact, we need not decide whether the two other standing requirements of traceability and redressability have been met.
 
 III CONCLUSION
 
 44
 It could be argued that if no one among this diverse group of plaintiffs has standing to challenge the IRS' application of Sec. 501(c)(3) to the Church, then perhaps no one could ever have standing to raise this issue. But such is irrelevant for determining whether the "case" or "controversy" requirement has been satisfied. See Valley Forge, 454 U.S. at 489, 102 S.Ct. at 767; Richardson, 418 U.S. at 179, 94 S.Ct. at 2947-48; Reservists, 418 U.S. at 227, 94 S.Ct. at 2935 ("The assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing."). As the Supreme Court noted, that "view would convert standing into a requirement that must be observed only when satisfied." Valley Forge, 454 U.S. at 489, 102 S.Ct. at 767. Moreover, the lack of a plaintiff to litigate an issue may suggest that the matter is more appropriately dealt with by Congress and the political process. Richardson, 418 U.S. at 179, 94 S.Ct. at 2947-48.
 
 
 45
 Without reaching or deciding whether there are prudential reasons not to exercise jurisdiction, we conclude that plaintiffs have not met the Article III minimum requirements for standing. In sum, we hold that none of the plaintiffs has standing, that the district court therefore did not have subject matter jurisdiction, that the contempt adjudication must be vacated, and that the order denying the motion to dismiss the case must be reversed and the plaintiffs' complaint dismissed.
 
 
 46
 Reversed and complaint dismissed.
 
 JON O. NEWMAN, Circuit Judge, dissenting:
 
 47
 The Court today rules that tax-exempt organizations advocating the right to an abortion have no standing to challenge the actions of the Internal Revenue Service in failing to enforce against the Catholic Church the statutory requirement that prohibits tax-exempt organizations from "participat[ing] in, or interven[ing] in ... any political campaign...." 26 U.S.C. Sec. 501(c)(3) (1982). The Court reaches this result by concluding that the "pro-choice" organizations are not competitors of the Catholic Church in the political arena on the subject of abortion. Because I believe that conclusion is incorrect--indeed, that it is contrary to the undisputed facts of the abortion controversy in Twentieth Century America, I respectfully dissent.
 
 
 48
 The majority begins its analysis by labeling the issue that divides us as "Competitive Advocate Standing." I think that is an admirable designation. The majority then recognizes that standing is frequently recognized for those who seek to challenge the lawfulness of governmental actions that inure to the benefit of their competitors. See Texas Monthly v. Bullock, --- U.S. ----, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989); Clarke v. Securities Industry Ass'n, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987); Investment Company Institute v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); Arnold Tours v. Camp, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970) (per curiam); Ass'n of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The majority then concludes that the competitor standing rule of these cases does not apply to the tax-exempt "pro-choice" organizations that are plaintiffs in this suit because they do not intervene in political campaigns.
 
 
 49
 That conclusion rests on a needlessly narrow view of both the realities of American political life and the contours of the doctrine of competitive advocate standing. To be an advocate in the political arena in this country, organizations and their members need not intervene in the campaign of any particular candidate for public office. Political advocacy takes many forms. To promote their views, a few people run for office. Others support candidates. But most Americans advocate their side of public issues by standing up for what they believe through a wide range of activities beyond the formal processes of electoral politics. They speak to their friends and neighbors; they participate in community activities; they devote their time, their energy, and sometimes their money to their causes. All who engage in these activities are competing in the arena of public advocacy with those who choose to support differing points of view by various forms of advocacy, including backing like-minded political candidates.
 
 
 50
 The competition necessary to confer competitor standing need not be in the identical activity of one's economic or philosophical opponent. When the Texas Monthly challenged the tax exemption of religious magazines, it did not wish to compete in the precise activity of publishing religious magazines. It wished to compete in the broader field of magazine publishing, and it was accorded standing to challenge the economic benefit of a tax exemption conferred upon the competitive publisher of a religious magazine. So here, plaintiffs Abortion Rights Mobilization, Inc. and the National Women's Health Network, Inc. do not wish to compete in the political arena with the Catholic Church on the issue of abortion by the precise technique of supporting candidates for public office. Instead, they have chosen to compete in advocating their side of the abortion issue by distributing information on the availability of abortions, by speaking, writing, and marching, and by championing in countless other ways the cause of abortion rights.
 
 
 51
 If the words are to have any meaning at all, these plaintiffs are indisputably "competitive advocates" of the Catholic Church on the issue of abortion.
 
 
 52
 The majority reckons with the argument that the plaintiff 501(c)(3) organizations might qualify as competitive advocates if they "simply advocate the pro-choice cause and stop short of supporting candidates." Maj. op. at 1030. The argument is dismissed by the assertion that the strongly held beliefs of the plaintiffs "are not a substitute for injury in fact." Id. Of course, they are not. But no one claims they are. The injury in fact is the competitive disadvantage the plaintiff organizations are obliged to endure when, accepting at this stage the allegations of the complaint, the Catholic Church is permitted to violate the tax laws by using tax-exempt donations to support the "anti-abortion" side of the national debate through contributions to like-minded political candidates, while the plaintiff organizations must confine their advocacy of the "pro-choice" side to those insubstantial lobbying activities that the tax laws permit. If the allegations of the complaint are true, and plaintiffs seek only the opportunity to prove them, the plaintiff organizations are seriously injured both in the eyes of the law and in the real world of political advocacy by the significant advantage currently enjoyed by the Catholic Church as a result of governmental action that violates the tax laws. According to the complaint, the Catholic Church is using its tax-free funds to support political candidates who oppose the right to an abortion; the plaintiff 501(c)(3) organizations, abiding by the terms of the tax law, are limited to other forms of advocacy. Both sides are competing in the arena of public advocacy, but governmental action is tolerating a law violation that enables one side to promote its cause with a significant technique denied to the other side. That should be sufficient to permit the claim of law violation to be litigated.
 
 
 53
 In the majority's view, the plaintiff 501(c)(3) organizations and the Catholic Church are not competitors in the arena of public advocacy on the issue of abortion because the plaintiffs "choose not to match the Church's alleged electioneering with their own." That makes it sound as if the plaintiff 501(c)(3) organizations have simply decided as a matter of personal preference that they do not wish to match the Church's alleged electioneering. But the decision to forgo electioneering is not a matter of personal preference, it is obedience to a requirement of an act of Congress. I fail to understand why any person or organization, seeking to challenge a violation of federal law, should be denied access to a federal court for the reason that it is obeying the law.
 
 
 54
 The majority further supports its rejection of competitive advocate standing by expressing concern that such standing would be too extensive, that "it would be difficult to deny standing to any person who simply expressed an opinion contrary to that of the Catholic Church." Maj. op. at 1030. I think this fear is groundless. The competition that most clearly creates standing in this case is not between the Catholic Church and every citizen who holds a contrary view on the issue of abortion. Such citizens are not limited by a statute that they are prepared to prove the Catholic Church is violating to their disadvantage. The competition is between those tax-exempt organizations that are abiding by the limitations of section 501(c)(3) in their advocacy on the abortion issue and the Catholic Church, which is violating these limitations in the advocacy of its point of view on the issue. Whether an individual citizen could challenge the Church's tax exemption on the theory that its unlawful support of political candidates is aided by tax-free donations unavailable to the ordinary citizen is a question far beyond the narrow issue we are required to decide in this case. A standing doctrine is entirely within manageable bounds when it recognizes the competition among organizations all of which are subject to the same statutory restraint and permits the law-abiding competitors to challenge the governmental action that enables one organization to violate that restraint to the detriment of the others.
 
 
 55
 A variant of the competitive advocate doctrine should also confer standing on the one plaintiff that is a 501(c)(4) organization, Long Island National Organization for Women-Nassau ("Nassau NOW"). This plaintiff, by qualifying as a tax-exempt organization under section 501(c)(4), is not subject to the restraints on political activity imposed by section 501(c)(3), but is obliged to solicit donations that are not tax deductible to the donors. See Regan v. Taxation With Representation, 461 U.S. 540, 543, 103 S.Ct. 1997, 1999-2000, 76 L.Ed.2d 129 (1983). Like the 501(c)(3) plaintiffs, Nassau-NOW competes with the Catholic Church in the arena of public advocacy on the issue of abortion, but does so under a competitive disadvantage that is different from the one existing between the Church and the 501(c)(3) plaintiffs. The latter may not support political candidates at all, while the Church, though barred from doing so, provides such support (according to the complaint). Nassau-NOW may engage in political activity but only with donations that cost its donors 100 cents on the dollar, while the Church supports political candidates with tax deductible donations that cost its donors only 67, 72, or 85 cents for every dollar contributed, depending on whether they are in the 33%, 28% or 15% bracket. That competitive disadvantage, arising from what plaintiffs are prepared to prove is a violation of law, is also sufficient to confer standing on the entity that is disadvantaged.
 
 
 56
 Whether any of the other plaintiffs have standing presents issues that I need not decide. We are asked to adjudicate the lawfulness of a contempt citation for refusing lawful discovery requests that has been challenged solely on the ground that the District Court lacks jurisdiction over the subject matter of the complaint. If any one plaintiff has standing to bring this lawsuit, the jurisdiction of the District Court to require compliance with the discovery requests is established, and the contempt judgment against the recalcitrant witnesses should be affirmed. For these reasons, I respectfully dissent.
 
 ON REHEARING
 PER CURIAM:
 
 57
 Appellants have sought rehearing, alleging inconsistency between the opinion in this case and an opinion issued by another panel in Fulani v. League of Women Voters Education Fund, 882 F.2d 621 (2d Cir.1989). In Fulani, competitor standing was accorded to a political candidate to challenge her exclusion from a televised debate in which her political rivals were invited to participate. A majority of the panel concluded that she suffered sufficient injury to establish standing. In the present case, though this panel is divided as to whether the plaintiffs are sufficiently in competition with the Catholic Church to have suffered injury that confers standing, we are in agreement that the competition in Fulani is more direct and immediate that that shown here.
 
 
 58
 The petition for rehearing is denied.
 
 
 
 [1]
 The Supreme Court held that although diminished opportunity for plaintiffs' children to obtain desegregated public education stated a cognizable injury in fact, the complaint failed to satisfy the standing requirement of traceability and redressability. Allen, 468 U.S. at 757, 104 S.Ct. at 3327-28
 
 
 [2]
 Because we hold that the advocate competitor plaintiffs have not established an injury in fact, we need not decide whether they are " 'arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.' " See Clarke v. Securities Indus. Ass'n, 479 U.S. at 396, 107 S.Ct. at 755 (quoting Data Processing, 397 U.S. at 153, 90 S.Ct. at 830); Valley Forge, 454 U.S. at 474-75, 102 S.Ct. at 759-60 (describing zone of interest test as a prudential concern to be evaluated after the prerequisites of Article III are satisfied)