[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
————————————————

No. 14-10326
Non-Argument Calendar
————————————————

D.C. Docket No. 2:13-cv-00214-WKW-WC


JOHNNY FORD, LOUIS MAXWELL,
THEODORE SAMUEL,DYANN ROBINSON,
BARBARA HOWARD,in their individual and representative capacities,
WILLIE PATTERSON, in his individual capacity,

Plaintiffs-Appellants,


versus


LUTHER J. STRANGE, III, individually and in his official capacity as
Attorney General for the State of Alabama,
ROBERT BENTLEY, Governor, individually and in
his official capacity as Governor for the State of Alabama,

Defendants-Appellees.


————————————————

Appeal from the United States District Court
for the Middle District of Alabama
————————————————

(September 3, 2014)

Before MARTIN, ROSENBAUM  and ANDERSON, Circuit Judges.

PER CURIAM:

Plaintiffs appeal the dismissal of their Complaint, the denial of their Motion for Leave to File Amended Complaint, and the grant of Defendant Strange's Motion for Sanctions under Rule 11 of the Federal Rules of Civil Procedure.  For the following reasons, we affirm.

## I.    BACKGROUND

### A.    Amendment 744 to the Alabama Constitution

In the State of Alabama, it is a crime to possess, "with knowledge of the character thereof," a "slot machine" or "other gambling device, with the intention that it be used in the advancement of unlawful gambling activity."  Ala. Code § 13A-12-27.  The Alabama Constitution, however, provides for the adoption of "amendment[s] which affect[] or appl[y] to only one county" if approved by, inter alia, a majority vote of the qualified electors in that county.  See Ala. Const. amend. 555(a).  The voters of Macon County approved local Amendment 744 in 2003.  Amendment 744 legalized "[t]he operation of bingo games for prizes or money by nonprofit organizations for charitable, educational, or other lawful purposes" in Macon County.  See Ala. Const. amend. 744.  It also provides that "[t]he sheriff shall promulgate rules and regulations for the licensing and operation

2

of bingo games within the county" and "shall insure compliance pursuant to any rule or regulation" and certain other specified requirements.  Id.

### B.    Factual Allegations in Plaintiffs' Complaint

According to the Complaint, Plaintiff Ford was the state legislator who sponsored the bill proposing Amendment 744 in 2003.  He is also currently the mayor of the City of Tuskegee in Macon County.  According to the Complaint, Ford and four of the five other individual plaintiffs—Maxwell, Samuel, Robinson, and Howard—all voted for Amendment 744 when it was put to a popular referendum in Macon County.[1]  Each of these individuals is also the officer of an organization that received a license to operate bingo games pursuant to Amendment 744.[2]  Although the caption of the Complaint names each of these individuals only in his or her "individual and representative capacit[y],"[3] the body of the Complaint indicates that they also brought suit in their official capacities as representatives of these organizations.  Each of the licensed organizations contracted with a third party, VictoryLand, to operate games in Macon County on

---

[1]    Plaintiff Patterson was not registered to vote in Macon County until 2007.

[2]    Ford is the mayor of the City of Tuskegee and the chairman of the Utilities Board. Maxwell is the chairman of the Macon County Commission.  Samuel is the president of the Macon County Board of Education.  Robinson is the director of the Tuskegee Repertory Theatre. Howard is the president of the Tuskegee-Macon County branch of the NAACP.

[3]    Plaintiffs sought to be certified as class representatives.  See infra Part I.C.

3

the license-holder's behalf.[4]  Plaintiff Patterson is a former VictoryLand employee. VictoryLand is not a party to this case.

Defendant Bentley is the Governor of the State of Alabama.  He is a white member of the Republican Party.  Defendant Strange is the elected Attorney General of the State of Alabama.  Both defendants were sworn into office in January 2011.  Plaintiffs maintain that Defendants subsequently used their powers as state officers to have VictoryLand shut down as part of a scheme to disempower black and Democratic voters in Macon County.  Specifically, Plaintiffs alleged that Defendants caused certain equipment at VictoryLand to be seized, removed, or destroyed, including electronic gaming machines that the Macon County sheriff had had certified as "legal bingo games," in compliance with Amendment 744 and regulations issued thereunder.  It is clear that Defendants acted under at least the pretext of a valid law-enforcement action.  See Ex parte State, 121 So. 3d 337, 340, 355 (Ala. 2013) (per curiam) (ordering the lower court to issue a warrant authorizing the search of VictoryLand "as to certain allegedly illegal gambling devices" and stating that the Macon County sheriff's opinion is not binding "on all other law-enforcement officers").  Plaintiffs insinuated in the Complaint, however, that Defendants actually shut down VictoryLand because its existence tended to

---

[4]    Amendment 744 expressly authorizes a "nonprofit organization" to "enter into a contract with any individual, firm, association, or corporation to have the individual or entity operate bingo games or concessions on behalf of the nonprofit organization."  Ala. Const. amend. 744(4).

4

benefit the Democratic Party.  Plaintiffs also insinuated that Defendants showed favoritism toward Indian gaming interests (to VictoryLand's detriment) in exchange for financial and political support.  Plaintiffs further alleged that VictoryLand's demise caused its employees—presumably including Plaintiff Patterson—to lose their jobs and that it will cause local citizens to lose public services that had previously been funded from VictoryLand's revenues.

### C.    Plaintiffs' Legal Claims in the Original Complaint

Plaintiffs brought suit in their individual and official capacities and also sought to be certified as representatives of the class of "all residents and qualified voters of Macon County who are injured by the statutory and constitutional violations alleged in this complaint."  In their Complaint, Plaintiffs brought four counts.  In Count One, Plaintiffs claimed a violation of their rights under section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c, on the ground that Defendants had implemented "unprecleared policies and practices affecting voting."[5]  The district court dismissed this claim <u>sua sponte</u> following the Supreme Court's decision in <u>Shelby County v. Holder</u>, ___ U.S. ___, 133 S. Ct. 2612 (2013), and Plaintiffs have since abandoned it.

---

[5]    Section 5 of the Voting Rights Act contains an implied private right of action.  <u>Allen v. State Bd. of Elections</u>, 393 U.S. 544, 557, 89 S. Ct. 817, 827 (1969).

In Count Two, Plaintiffs claimed a violation of their right to vote under section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973.[6] Plaintiffs' theory was apparently that Defendants had infringed their voting rights, and the voting rights of African-Americans in the putative class, by taking actions that undermined Amendment 744 years after those voters had supported it.

In Count Three, Plaintiffs claimed "purposeful discrimination" in violation of section 2 of the Voting Rights Act, 42 U.S.C. § 1973, and the Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution.[7] Plaintiffs' theory was that Defendants had acted with the racially-discriminatory purpose and effect of denying them, and African-American voters in Macon County more broadly, "the ability to choose by constitutional amendment the laws and means of their enforcement in their own counties" and "the ability to exercise home rule in their respective counties."[8] Plaintiffs asserted that Defendants had

---

[6]    A majority of the Supreme Court has indicated that section 2 of the Voting Rights Act contains an implied private right of action. Morse v. Republican Party of Va., 517 U.S. 186, 232, 116 S. Ct. 1186, 1212 (1996) (two Justices); id. at 240, 116 S. Ct. at 1216 (three Justices). These Justices quoted from a Senate Judiciary Committee report that was generated during the 1982 amendment process. S. Rep. No. 97-417, at 30 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 208 ("[T]he committee reiterates the existence of the private right of action under section 2, as has been clearly intended by Congress since 1965.").

[7]    Plaintiffs brought their constitutional claims pursuant to 42 U.S.C. § 1983, which "provides a cause of action for constitutional violations committed under color of state law." Burton v. City of Belle Glade, 178 F.3d 1175, 1187–88 (11th Cir. 1999).

[8]    In this regard, Plaintiffs alleged that Alabama is majority white and that Macon County and the City of Tuskegee are majority black. Plaintiffs also alleged, inter alia, that the

6

"abridged and negated the 2003 vote enacting Amendment 744 and [had] devastated and continue to devastate Tuskegee, Macon County, and its citizens." Plaintiffs explained that, "[b]y the closing of Victory[L]and, a historically poverty stricken area of black citizens will remain so and public services that Victory[L]and's operating revenue would have funded will be curtailed or eliminated altogether."

In Count Four, Plaintiffs claimed "fundamental unfairness" in violation of their "due process rights."  Plaintiffs asserted that Defendants had unlawfully caused the invalidation of their rights in their licenses to operate bingo games in Macon County pursuant to Amendment 744.

Defendants moved to dismiss the Complaint for both lack of standing and also failure to state a claim.  After full briefing, the district court granted Defendants' motions on both grounds.  Plaintiffs appeal that decision.

## D.    Plaintiffs' Proposed First Amended Complaint

In the court below, Plaintiffs moved for leave to file a First Amended Complaint.  We summarize a subset of the most substantial proposed amendments. First, Plaintiffs proposed to add as plaintiffs the sheriff of Macon County, the

---

organizations licensed to operate bingo games in Macon County are "headed by predominantly black leaders and serve the predominantly black citizens of Macon County."

Macon County Racing Commission, and the Macon County Water Authority.[9]

Second, Plaintiff Patterson proposed to prosecute the lawsuit both on his own behalf and also as a representative of all others who had lost their jobs as a result of VictoryLand's demise. Third, Plaintiffs specifically alleged that Defendant Strange had "not operated in an even-handed manner" because, in another lawsuit, he had asserted that the Alabama Poarch Band of Creek Indian Casino Operators ("Poarch Creeks") were operating gaming machines in violation of state law, but he had not raided, seized equipment from, or otherwise adversely affected the Poarch Creeks' operations. Fourth, Plaintiffs alleged in greater detail the economic injury that the closing of VictoryLand had caused Macon County, its citizens, and the organizational plaintiffs.[10] Fifth, Plaintiffs proposed to add three additional counts, which we describe below.

In the first proposed additional count, Plaintiffs asserted that Defendants conspired to deny them their "constitutional right to vote without due process of law and as a denial of the equal protection [sic] as guaranteed by the First, Fifth, Thirteenth, Fourteenth, and Fifteenth Amendments to the United States

---

[9]    Plaintiffs also proposed to explicitly name all of the aforementioned organizational plaintiffs in the caption.

[10]    For example, Plaintiffs alleged the loss of 2300 local jobs, which were primarily held by African-Americans, and the loss of revenue to "various governmental and charitable organizations" (including at least some of the organizational plaintiffs) in the form of taxes, fees, and gaming revenues. Plaintiffs also indicated that at least some of the organizational plaintiffs had cut, or would cut, projects or services as a result.

Constitution in violation of [42 U.S.C. §§ 1981, 1983]" by "intentionally nullify[ing]" their votes in favor of Amendment 744, its sponsor (then-Representative Ford), and the elected sheriff of Macon County.  In the second proposed additional count, Plaintiffs claimed that Defendants participated in a racially- or class-motivated conspiracy to deny them their "property right to contract, or to own, operate, and maintain a bingo business in Macon County, Alabama[,] without due process of law as guaranteed by the First, Fifth, Thirteenth, and Fourteenth Amendments to the United States Constitution in violation of [42 U.S.C. §§ 1981, 1983, 1985]" by usurping the authority vested in the sheriff of Macon County and shutting down VictoryLand, while permitting the Poarch Creeks and another facility in Greene County to use the same or similar machines.   In the third proposed additional count, Plaintiffs claimed that Defendants had negligently allowed their rights to be infringed in violation of 42 U.S.C. § 1986.

After full briefing, the district court denied Plaintiffs' motion to amend the complaint on the ground that the proposed amendments were futile.  Plaintiffs appeal that decision.

### E.    Defendant Strange's Motion for Sanctions

Two days after receiving the initial Complaint, Defendant Strange notified Plaintiffs' counsel, Donald LaRoche, of his intent to seek sanctions under Rule 11

9

unless the Complaint was voluntarily dismissed.  Plaintiffs did not voluntarily dismiss the Complaint, and Defendant Strange filed a written Motion for Sanctions.  Plaintiffs opposed the motion in writing without requesting a hearing or any additional process.  The district court granted the motion on the ground that attorney LaRoche should have known that Plaintiffs' claims were "objectively frivolous."[11]  Worldwide Primates, Inc. v. McGreal, 87 F.3d 1252, 1254 (11th Cir. 1996); see also Fed. R. Civ. P. 11(b)(2).  Plaintiffs appeal that decision.  We address each of the three appealed decisions in turn.

## II.    THE DISMISSAL OF PLAINTIFFS' COMPLAINT

The district court dismissed Plaintiffs' Complaint on the grounds that Plaintiffs lacked Article III standing to bring the claims asserted and, in any event, had failed to state any claims upon which relief could be granted.  We address the standing question first because it implicates our Court's and the lower court's authority to resolve Plaintiffs' claims on the merits.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95, 118 S. Ct. 1003, 1012–13 (1998).  To the extent necessary, we then address whether Plaintiffs successfully stated any claims upon which relief could be granted.

### A.    Whether Plaintiffs Established Article III Standing to Assert Their Claims

---

[11]    The district court did not impose sanctions against Plaintiffs' other three attorneys, who joined Plaintiffs' litigation team only after the Complaint and the Motion for Sanctions had been filed.

"[T]he irreducible constitutional minimum of standing contains three elements." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136 (1992).

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Id. at 560–61, 112 S. Ct. at 2136 (alterations, footnote, citations, and internal quotation marks omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." Id. at 561, 112 S. Ct. at 2136. "The standing inquiry is both plaintiff-specific and claim-specific. Thus, a reviewing court must determine whether each particular plaintiff is entitled to have a federal court adjudicate each particular claim that he asserts." Pagán v. Calderón, 448 F.3d 16, 26 (1st Cir. 2006) (citing Allen v. Wright, 468 U.S. 737, 752, 104 S. Ct. 3315, 3325 (1984), arguably abrogated on other grounds, Lexmark Int'l, Inc. v. Static Control Components, Inc., ___ U.S. ___, ___ & n.3, 134 S. Ct. 1377, 1386–88 & n.3 (2014) (explaining that the "zone of interests" test is not an aspect of "prudential standing")).

11

The district court held that Plaintiffs failed to allege any "injury in fact" that was sufficient to support Article III standing. Plaintiffs asserted two broad categories of injury in the Complaint: the "nullification" of their votes in favor of Amendment 744, and economic injury caused by VictoryLand's demise. We address each category of injury in turn.

### 1.    Purported Injury to the Individual Plaintiffs' Voting Rights

In general, "[w]here a plaintiff's voting rights are curtailed, the injury is sufficiently concrete to count as an 'injury in fact.'" Judge v. Quinn, 612 F.3d 537, 545 (7th Cir. 2010); see also 13A Charles Alan Wright et al., Federal Practice and Procedure § 3531.4, at 185 (3d ed. 2008) ("Electoral interests are among the abstract interests that support standing in a wide variety of settings."). As the district court observed, however, Plaintiffs complain of actions that took place years after they supported and voted for Amendment 744. The question is whether they have nevertheless alleged "injury in fact" to cognizable voting rights.

The jurisdictional question of whether Plaintiffs have alleged "injury in fact" to cognizable voting rights is perhaps intertwined with the merits question of what "voting rights" are protected by the statutory and constitutional provisions invoked. When jurisdictional and merits question are intertwined, federal courts at least

12

sometimes find that jurisdiction exists and then proceed to analyze the merits.[12] See Williamson v. Tucker, 645 F.2d 404, 415 (5th Cir. May 1981) ("Where the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits . . . .");[13] Massachusetts v. E.P.A., 415 F.3d 50, 55–56 (D.C. Cir. 2005) (opinion of Randolph, J.) (assuming Article III standing arguendo where the standing inquiry overlapped with the merits inquiry), rev'd on other grounds, 549 U.S. 497, 516–26, 127 S. Ct. 1438, 1452–58 (2007) (finding Article III standing explicitly before proceeding to the merits).  But see Cone Corp. v. Fla. Dep't of Transp., 921 F.2d 1190, 1204 n.45 (11th Cir. 1991) (ordering dismissal for lack of standing after an "unavoidable" and "limited inquiry into the merits of the plaintiff's claim to determine whether the injury the plaintiff asserts might stem from a violation of [a] constitutional guarantee").  Even in those circumstances,

---

[12]    Our predecessor court explained two reasons for this practice.  First, "[j]udicial economy is best promoted when the existence of a federal right is directly reached and, where no claim is found to exist, the case is dismissed on the merits." Williamson v. Tucker, 645 F.2d 404, 415 (5th Cir. May 1981).  Second, a "refusal to treat indirect attacks on the merits as Rule 12(b)(1) motions provides . . .  a greater level of protection to the plaintiff who in truth is facing a challenge to the validity of his claim." Id.  Specifically, resolution of "a Rule 12(b)(1) motion can be based on the court's resolution of disputed facts," whereas Rule l2(b)(6) and Rule 56 motions require the court to assume certain facts in the plaintiff's favor. Id. at 415−16.

[13]    In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

however, dismissal on jurisdictional grounds may be proper if the plaintiff's claims are "'wholly insubstantial and frivolous.'"  Williamson, 645 F.2d at 415 (quoting Bell v. Hood, 327 U.S. 678, 682–83, 66 S. Ct. 773, 776 (1946)); cf. Steel Co., 523 U.S. at 89, 118 S. Ct. at 1010 ("Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of [the Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" (quoting Oneida Indian Nation of N.Y. v. County of Oneida, 414 U.S. 661, 666, 94 S. Ct. 772, 777 (1974))); Donahue v. City of Boston, 304 F.3d 110, 119 (1st Cir. 2002) ("Where the absence of causation and a relevant injury-in-fact are presented with such clarity, dismissal for lack of subject-matter is justified.").

Under either analysis, we affirm the dismissal of Counts Two and Three on jurisdictional grounds.  Plaintiffs have not alleged injury to any cognizable "voting rights" for the simple reason that their "asserted basis for standing has nothing to do with voting."  Abortion Rights Mobilization Inc. v. Baker (In re U.S. Catholic Conference), 885 F.2d 1020, 1028 (2d Cir. 1989).[14]  Plaintiffs allege that

---

[14]    In In re U.S. Catholic Conference, the relevant plaintiffs were voters committed to supporting "a woman's right to obtain a legal abortion."  885 F.2d at 1021.  The injury they asserted was "arbitrary inequality . . . in the political process vis-a-vis the Catholic Church[,] created by the IRS's grant of tax exemption to the latter."  603 F. Supp. 970, 973–74 (S.D.N.Y. 1985).  The plaintiffs brought suit in order "to force the government to revoke the Catholic Church's tax-exempt status."  885 F.2d at 1021.  The district court held that these plaintiffs had "voter standing" to sue.  885 F.2d at 1028.  The Second Circuit rejected this characterization, noting that the plaintiffs had not alleged "that their vote has been diluted or that voting district

14

Defendants undermined Amendment 744 several years after Plaintiffs had supported it.[15]  To the extent that Plaintiffs assert a "voting right" to the post-enactment enforcement of the laws that they vote for, their claims are "wholly insubstantial and frivolous."  Section 2 of the Voting Rights Act protects a right to equal-opportunity participation in the electoral process.  See Thornburg v. Gingles, 478 U.S. 30, 47, 106 S. Ct. 2752, 2764 (1986) ("The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.").  We find no authority for the proposition that it purports to protect a voter's interest in the post-enactment enforcement of the laws that he supports.[16]  See, e.g., 42 U.S.C. § 1973*l*(c)(1) (defining the words "vote" and "voting").  We consequently affirm the district court's dismissal of Count Two on jurisdictional grounds.

---

lines have been gerrymandered to favor the Church or that anyone has 'stuffed the ballot box' with votes for Church-backed candidates or that anyone has been prevented from voting."  Id. The court also concluded that the plaintiffs did not have standing to sue under a "competitive advocates" theory.  Id. at 1028–31.

[15]    We offer no opinion about whether Defendants actually undermined Amendment 744.

[16]    Indeed, we question whether the statute could create such an "'individual right' vindicable in the [federal] courts" in light of Article III's "Case" or "Controversy" requirement. See generally Lujan, 504 U.S. at 576–77, 112 S. Ct. at 2145; cf. Hollingsworth v. Perry, ___ U.S. ___, ___, 133 S. Ct. 2652, 2662–63 (2013) (holding that the proponents of California's Proposition 8 did not have Article III standing to defend it on appeal).

For similar reasons, we affirm the district court's dismissal of Count Three on jurisdictional grounds. In Count Three, Plaintiffs again claimed injury to what can fairly be described as their purported "voting rights."[17] As the district court observed, however, the connection between Defendants' alleged conduct and Plaintiffs' votes—which were cast years earlier—is simply too tenuous to establish "injury in fact" to any voting rights protected by either section 2 of the Voting Rights Act or the Thirteenth, Fourteenth, or Fifteenth Amendments to the United States Constitution. There is no dispute that Amendment 744 is the law of Alabama, and Plaintiffs do not allege that their rights to vote for or otherwise support the amendment were violated in 2003. That Plaintiffs supported the amendment does not ipso facto give them a "personal stake" in its enforcement years later. See Hollingsworth v. Perry, ___ U.S. ___, ___, 133 S. Ct. 2652, 2663 (2013).

### 2.    Alleged Economic Injury to Plaintiff Patterson and the Organizational Plaintiffs

---

[17]    To the extent that Plaintiffs sought to establish standing based on economic injury to "Tuskegee, Macon County, and its citizens," they failed. Plaintiff Ford is the mayor of Tuskegee, but he never argued that he sought to remedy injury to the City as a municipality (rather than as the holder of a license to operate bingo games). He also failed to allege any injury to the City qua municipality, such as a loss of tax revenue. See Chiles v. Thornburgh, 865 F.2d 1197, 1208–09 (11th Cir. 1989); Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 110–11, 99 S. Ct. 1601, 1613 (1979). He, furthermore, never argued that the City sought to bring suit as parens patriae, and we decline to make or entertain this argument today. Macon County, moreover, has never been a party to this suit, and none of the individual plaintiffs purporting to represent the citizens of Macon County alleged any particularized economic injury that was shared by members of the putative class, such as a loss of public services previously received.

We conclude, however, that individual plaintiff Patterson and all of the organizational plaintiffs did have standing to bring a claim of "fundamental unfairness" under Count Four.[18]  Individual plaintiff Patterson alleged that he was a VictoryLand employee, and it is reasonable to infer that he would have lost his job as a result of VictoryLand's demise.  The organizational plaintiffs, moreover, claimed that Defendants effectively caused their rights under the licenses to be unlawfully invalidated, and it is reasonable to infer that this would have caused them to suffer a loss of associated gaming revenues.  These economic injuries constitute sufficient "injury in fact" to support standing, and according to the allegations in the Complaint, they were caused by Defendants' actions and could be redressed by a favorable decision.[19]  We consequently proceed to the merits of Plaintiffs' claim under Count Four.[20]

### B.    Whether Count Four States a Claim Upon Which Relief Can Be Granted

---

[18]    We **AFFIRM** the dismissal of this claim on jurisdictional grounds as to all other individual plaintiffs.

[19]    The district court apparently believed that, in Count Four, Plaintiffs again sought to remedy an injury to purported "voting rights."  We disagree.  In Count Four, we understand Plaintiffs to have sought a remedy for the alleged deprivation of their purported rights in the bingo licenses and the economic injury that allegedly resulted.

[20]    We note that the Eleventh Amendment did not bar Plaintiffs from bringing this claim in federal court.  See generally Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 104 S. Ct. 900 (1984).  Although Plaintiffs complained that Defendants had violated state law, they sought relief from a purported violation of their federal due process rights.  See Brown v. Ga. Dep't of Revenue, 881 F.2d 1018, 1023–24 (11th Cir. 1989).

17

In Count Four, Plaintiffs attempted to state a claim for violation of their constitutional due process rights. To the extent that Plaintiffs invoked the substantive component of the Due Process Clause, they failed to state a claim because their purported rights in the bingo licenses are created and defined by state law. "[N]on-legislative deprivations of state-created rights . . . cannot support a substantive due process claim, not even if the plaintiff alleges that the government acted arbitrary [sic] and irrationally." Greenbriar Vill., L.L.C. v. Mountain Brook, City, 345 F.3d 1258, 1263 (11th Cir. 2003) (per curiam). "The only exception to this rule is when the state-created right is deprived in a manner that implicates a fundamental right, for example, when a state employee is fired in violation of the First Amendment for expressing his views." Id. at 1262 n.3. Plaintiffs' claim in Count Four did not implicate a fundamental right. Plaintiffs expressly complained that their "rights in their [bingo] licenses" had been "improperly invalidated." They did not plausibly claim a violation of their voting rights or of any other fundamental right in Count Four.

To the extent that Plaintiffs invoked the procedural component of the Due Process Clause, they were required to allege: "(1) deprivation of a constitutionally protected property interest; (2) governmental action; (3) and constitutionally inadequate process." Miccosukee Tribe of Indians of Fla. v. United States, 716 F.3d 535, 559 (11th Cir. 2013). We question whether Plaintiffs successfully

18

alleged the first element, i.e., the deprivation of a constitutionally protected property interest.  We have said that "no procedural due process claim exists until a sufficiently certain property right under state law is first shown."  Greenbriar Vill., 345 F.3d at 1265.  In this case, there is at least a "reasonable debate" regarding Plaintiffs' rights in the bingo licenses under Alabama law.  Id. at 1266.  Indeed, in February 2013, the Supreme Court of Alabama ordered a lower court to issue a warrant authorizing the search of VictoryLand "as to certain allegedly illegal gambling devices."  In an opinion explaining the order, the court held that

> [t]he games depicted in the surveillance video and described in the affidavit proffered . . . in support of the application for the warrant do not reasonably resemble a game of "bingo."  Without turning a blind eye to that which is depicted in the video and described in the affidavit, a "man of reasonable caution" could reach no conclusion other than that there is a "fair probability" that the machines in question are not the game of bingo and, instead, are slot machines or other gambling devices that are illegal under Alabama law.

Ex parte State, 121 So. 3d 337, 358 (Ala. 2013) (per curiam).  The uncertainty of Plaintiffs' right, if any, to operate the games in question at least arguably renders that right "unprotectable" as a matter of federal procedural due process.  Cf. Greenbriar Vill., 345 F.3d at 1266 ("'Indeed, if uncertainty as to the law did not preclude recognition of a federally protectable property interest, permit claimants would regularly be entitled to present to federal courts their disputes concerning the interpretation of local and state land use regulations.'" (quoting Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999))).

19

In any event, Plaintiffs have failed to allege the third element, i.e., constitutionally inadequate process.  Plaintiffs do not claim a violation of their Fourth Amendment rights,[21] and the Due Process Clause contains no independent guarantee of additional process before the seizure of suspected contraband by state law-enforcement officers under the circumstances at bar.  See Lord Abbett Mun. Income Fund, Inc. v. Tyson, 671 F.3d 1203, 1208 (11th Cir. 2012) ("Simply put, the due process clause does not require states to afford those who seek to profit from potentially criminal enterprises a hearing to establish the legality of the enterprise before state officers have begun a prosecution or forfeiture action."). We therefore affirm the district court's dismissal of Count Four for failure to state a claim.

## III.    THE DENIAL OF LEAVE TO FILE AN AMENDED COMPLAINT

The district court denied Plaintiffs' Motion for Leave to File Amended Complaint on the ground that the amendments would be futile.  "Ordinarily, a party must be given at least one opportunity to amend before the district court dismisses the complaint.  The district court, however, need not 'allow an amendment . . . where amendment would be futile.'"  Corsello v. Lincare, Inc., 428 F.3d 1008, 1014 (11th Cir. 2005) (per curiam) (citation omitted) (quoting Bryant v. Dupree, 252 F.3d 1161, 1163 (11th Cir. 2001) (per curiam)).  "Leave to amend a

---

[21]    We do not imply that such a claim would succeed.

20

complaint is futile when the complaint as amended would still be properly

dismissed . . . ." Cockrell v. Sparks, 510 F.3d 1307, 1310 (11th Cir. 2007) (per

curiam).  "Although we review a district court's denial of a motion to amend only

for abuse of discretion, we review de novo a decision that a particular amendment

to the complaint would be futile." Id.

We agree with the district court that Plaintiffs' "complaint as amended

would still be properly dismissed." Id. Former Count Two, which Plaintiffs

proposed to carry over from the original Complaint, would be subject to dismissal

for reasons already discussed. See supra Part II.A.1. The proposed addition of

certain plaintiffs and more specific allegations of economic injury would do

nothing to cure the defects in the original claim under section 2 of the Voting

Rights Act.

Plaintiffs proposed to convert former Count Three, titled "Purposeful

Discrimination," into a claim based on economic injury rather than solely "voting

rights" injury.[22] This claim would nevertheless be subject to dismissal for failure

to state a plausible claim of intentional discrimination, for reasons discussed

below. See infra.

---

[22]    For example, in the proposed First Amended Complaint, Plaintiffs added the following sentence to former County Three: "These discriminatory actions by the Defendants have adversely impacted the economic rights of the citizens of Macon County in violation of their constitutional rights." Plaintiffs also specifically alleged economic injury to the organizational Plaintiffs, including a loss of tax revenue to the City of Tuskegee. See supra note 17.

21

Former Count Four, which Plaintiffs proposed to carry over from the original Complaint, would be subject to dismissal for reasons already discussed. See supra Part II.B.  The proposed addition of certain plaintiffs and more specific allegations of economic injury would do nothing to cure the defects in the original due process claim.

The first proposed additional count is based on injury to purported "voting rights" and would, consequently, be subject to dismissal on the same jurisdictional grounds as the other "voting rights" claims.  See supra Part II.A.1.

In order to state a discrimination claim under both former Count Three ("Purposeful Discrimination") and also Plaintiffs' second proposed additional count, Plaintiffs were required to allege facts supporting a reasonable inference of intentional discrimination.[23]  See, e.g., Gen. Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 391, 102 S. Ct. 3141, 3150 (1982) ("[Section] 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination."); Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S. Ct. 1790, 1798 (1971) (holding that one element of a cause of action under § 1985(3)[24] is "racial,

---

[23]    To the extent that Plaintiffs also intended to reassert a due process claim in their second proposed additional count, the only deprivation they proposed to allege was of their purported rights in the bingo licenses.  This claim would therefore be subject to dismissal for at least the reasons explained supra in Part II.B.

[24]    As the district court noted, the proposed First Amended Complaint does not specify which subsection of § 1985 Plaintiffs rely on, but only subsection (3) offers a potentially-applicable legal theory.

or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action"). Plaintiffs failed to do so. Plaintiffs' proposed First Amended Complaint contains no allegations with respect to race other than allegations regarding: the relative racial makeup of the State versus the County and the City; the race of certain Plaintiffs, proposed additional plaintiffs, and Defendants; and historical discrimination against African-Americans in the State of Alabama. These allegations do not support "a reasonable expectation that discovery [would] reveal evidence" that these Defendants acted with racially-discriminatory animus.[25] Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965 (2007). Plaintiffs also failed to allege facts sufficient to support a reasonable inference of differential treatment. Indeed, as the district court noted in Part III.B of its Memorandum Opinion and Order denying Plaintiffs' Motion for Leave to File Amended Complaint, Plaintiffs' allegations suggest that Defendant Strange has treated comparable facilities equally, including the Greene County facility referred to in the proposed First Amended Complaint. Plaintiffs argue that

---

[25]    In the proposed First Amended Complaint, Plaintiffs quoted from United States v. McGregor, 824 F. Supp. 2d 1339, 1345–46 (M.D. Ala. 2011), in which the court found that two Alabama state senators, while discussing political strategy with "other influential Republican legislative allies," had evinced a desire to suppress the black vote in 2010. We do not ignore the possibility that racist sentiments "remain regrettably entrenched in the high echelons of [the Alabama] state government." Id. at 1347. Plaintiffs, however, have not plausibly alleged any link between any such racist sentiments and these specific Defendants. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted).

23

Defendants accorded preferential treatment to the Poarch Creeks' facility, but Plaintiffs did not plausibly allege that that facility is situated similarly to VictoryLand.[26] We note, in particular, that gaming on Indian lands is subject to an entirely distinct regulatory regime in which the State may often have a lesser role. See, e.g., Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721.[27]

---

[26] See, e.g., Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1273 (11th Cir. 2004) ("When comparing similarly situated individuals to raise an inference of discriminatory motivation, the individuals must be similarly situated in all relevant respects besides race, since different treatment of dissimilarly situated persons does not violate civil rights laws." (citation, alteration, and internal quotation marks omitted)); Campbell v. Rainbow City, 434 F.3d 1306, 1314 (11th Cir. 2006) (stating that the comparator in a "class of one" equal protection claim "must be prima facie identical in all relevant respects").

[27] "Indian tribes retain attributes of sovereignty over both their members and their territory, and . . . tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States." California v. Cabazon Band of Mission Indians, 480 U.S. 202, 207, 107 S. Ct. 1083, 1087 (1987) (citations and internal quotation marks omitted), superseded by statute, Indian Gaming Regulatory Act, Pub. L. No. 100-497, 102 Stat. 2467 (1988) (codified as amended at 25 U.S.C. §§ 2701–2721 (2012)).

The Indian Gaming Regulatory Act "divides gaming on Indian lands into three classes— I, II, and III—and provides a different regulatory scheme for each class." Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 48, 116 S. Ct. 1114, 1119 (1996). "Class I gaming 'means social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations' . . . ." Id. at 48 n.1, 116 S. Ct. at 1119 n.1 (quoting 25 U.S.C. § 2703(6)). "Class II gaming is more extensively defined to include," inter alia, "bingo" and "games similar to bingo." Id. (citing 25 U.S.C. § 2703(7)). "Class III gaming . . . is defined as 'all forms of gaming that are not class I gaming or class II gaming' and includes such things as slot machines, casino games, banking card games, dog racing, and lotteries." Id. at 48, 116 S. Ct. at 1119 (citation omitted) (quoting 25 U.S.C. § 2703(8)).

Regulation of class I gaming "is left by the Act to 'the exclusive jurisdiction of the Indian tribes.'" Id. at 48 n.1, 116 S. Ct. at 1119 n.1 (quoting 25 U.S.C. § 2710(a)(1)). "Regulation of class II gaming contemplates a federal role, but places primary emphasis on tribal self-regulation." Id. (citing 25 U.S.C. § 2710(c)(3)–(6)). "[C]lass III gaming is lawful only where it is," inter alia, "'conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State.'" Id. at 48–49, 116 S. Ct. at 1120 (quoting 25 U.S.C. § 2710(d)(1)). According to a leading treatise, it is "impossible to generalize" about the content of Tribal-State

24

Finally, Plaintiffs' third proposed additional count is entirely derivative of their proposed § 1985(3) claim and would therefore be subject to dismissal alongside it.  See Park v. City of Atlanta, 120 F.3d 1157, 1160 (11th Cir. 1997) (stating that "§ 1986 requires a violation of § 1985" and "only provides a cause of action in the existence of a § 1985(3) conspiracy").

## IV.    THE IMPOSITION OF SANCTIONS AGAINST ATTORNEY LAROCHE

Plaintiffs challenge the district court's imposition of sanctions against attorney LaRoche pursuant to Rule 11.  "An appellate court reviews all aspects of the district court's Rule 11 determination for an abuse of discretion."  Worldwide Primates, Inc. v. McGreal, 87 F.3d 1252, 1254 (11th Cir. 1996).

Rule 11 sanctions are proper, inter alia, "'when the party files a pleading that is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law.'"  Id. (quoting Jones v. Int'l Riding Helmets, Ltd., 49 F.3d 692, 694 (11th Cir.1995)); see also Fed. R. Civ. P. 11(b)(2), (c).  The district court imposed sanctions on this ground. We find no abuse of discretion.  We note that, in addition to the claims rejected

---

gaming compacts, and many "have provisions that deal with[, inter alia,] . . . tribal and state enforcement of compact provisions; allocation of civil, regulatory, and criminal jurisdiction and law enforcement; . . . [and] state inspection, testing, and approval of gaming devices and facilities." Cohen's Handbook of Federal Indian Law § 12.05[2] (Nell Jessup Newton ed., 2012).  Plaintiffs have not drawn our attention to any Tribal-State compact that governs gaming at the Poarch Creek facility.

25

supra in Part II, Plaintiffs initially claimed a violation of section 5 of the Voting

Rights Act of 1965, 42 U.S.C. § 1973c.  This claim had no reasonable chance of

success even before the Supreme Court's decision in Shelby County v. Holder, ___

U.S. ___, 133 S. Ct. 2612 (2013), for reasons discussed in Parts IV.B and IV.E of

the district court's Memorandum Opinion and Order granting Defendants' motions

to dismiss the Complaint.  See Presley v. Etowah Cnty. Comm'n, 502 U.S. 491,

503, 112 S. Ct. 820, 828–29 (1992) (construing section 5 to reach only changes

that have "a direct relation to voting and the election process").

Plaintiffs' counsel argues that the district court's imposition of sanctions

violated his due process rights because he was entitled to notice and an opportunity

to respond either orally or in writing.  Plaintiffs' counsel did have such an

opportunity.  Defendant Strange provided Plaintiffs' counsel with written notice of

his intent to seek sanctions.  He later filed a written Motion for Sanctions and

served it on Plaintiffs' counsel.  Plaintiffs' counsel filed a written response in

opposition and did not request a hearing or any other additional process.  Plaintiffs'

counsel does not explain why he was entitled to more.

## V.    CONCLUSION

For the foregoing reasons,[28] the judgment of the district court is

**AFFIRMED.**

---

[28]    Other arguments raised by the parties are rejected without need for discussion.

26