# In the
# United States Court of Appeals
# For the Second Circuit

August Term, 2019

Argued: December 20, 2019
Decided: June 23, 2020

Docket No. 18-3533

LETICIA COLON DE MEJIAS, CONNECTICUT FUND FOR THE
ENVIRONMENT, INC., FIGHT THE HIKE, ENERGY
EFFICIENCIES SOLUTIONS, LLC, BEST HOME PERFORMANCE
OF CT, LLC, CONNECTICUT CITIZEN ACTION GROUP, NEW
ENGLAND SMART ENERGY GROUP, LLC, CT
WEATHERPROOF INSULATION, LLC, STEVEN C OSUCH,
ENERGY ESC, LLP, JONATHAN CASIANO, BRIGHT
SOLUTIONS, LLC,

*Plaintiffs–Appellants,*

V.

NED LAMONT, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF
THE STATE OF CONNECTICUT, SHAWN WOODEN, IN HIS
OFFICIAL CAPACITY AS THE TREASURER OF THE STATE OF
CONNECTICUT, KEVIN LEMBO, IN HIS OFFICIAL CAPACITY AS
THE COMPTROLLER OF THE STATE OF CONNECTICUT,

*Defendants–Appellees.*[*]

---

[*] Effective January 2019, Ned Lamont became Governor of the State of Connecticut,
succeeding Daniel Malloy, and Shawn Wooden became Treasurer of the State of
Connecticut, succeeding Denise Nappier. Under Federal Rule of Appellate Procedure
43(c)(2), Governor Lamont is automatically substituted for former Governor Malloy and

Appeal from the United States District Court
for the District of Connecticut
No. 3:18-cv-817 (JCH) – Janet C. Hall, *Judge*.

Before:        WINTER, HALL, and SULLIVAN, *Circuit Judges*.

At issue in this case is (1) whether Connecticut's Public Act 17-2, as amended by Public Act 18-81, (the "Act"), which transfers money from the state's energy funds to the general purpose fund, violates the Contract Clause of the United States Constitution; and (2) whether the taxpayer standing doctrine bars Appellants' Equal Protection claim. The district court (Janet C. Hall, *J.*) granted summary judgment to Appellees on both grounds, determining that Appellants had no contractual right to prevent the transfer of money to the general purpose fund and that the Act is an allocation of state revenue, not a tax, so that the taxpayer standing doctrine bars Appellants' claim. We agree. The judgment of the district court is AFFIRMED.

> BENJAMIN M. WATTENMAKER (Stephen J. Humes, Holland & Knight LLP, John M. Wolfson, Feiner Wolfson, LLC, Roger Reynolds, Connecticut Fund for the Environment, *on the brief*), Feiner Wolfson, LLC, Hartford, CT, *for Plaintiffs-Appellants*.
>
> PHILLIP MILLER, Assistant Attorney General, *for* William Tong, Attorney General for the State of Connecticut, Hartford, CT, *for Defendants-Appellees*.

---

Treasurer Wooden is substituted for former Treasurer Nappier in this action. The Clerk of the Court is requested to amend the caption as above.

PETER W. HALL, *Circuit Judge*:

Plaintiffs-Appellants[1] appeal from the judgment of the United States District Court for the District of Connecticut (Janet C. Hall, *J.*), dated October 25, 2018, granting summary judgment in favor of Defendants-Appellees, the Governor, Treasurer, and Comptroller of the State of Connecticut (collectively, "Appellees"). The questions presented on appeal are (1) whether Connecticut's Public Act 17-2, as amended by Public Act 18-81, (the "Act"), which transfers money from the state's legislatively created energy funds (the "Energy Funds") to the general purpose fund (the "General Fund"), violates the Contract Clause of the United States Constitution; and (2) whether the taxpayer standing doctrine bars Appellants' Equal Protection claim.

## BACKGROUND

### I. Facts

In Connecticut, two types of entities provide electricity: investor-owned electric distribution companies ("EDCs") and municipal utilities. There are two

---

[1] Leticia Colon de Mejias; Connecticut Fund for the Environment, Inc.; Fight the Hike; Energy Efficiencies Solutions, LLC; Best Home Performance of CT, LLC; Connecticut Citizen Action Group; New England Smart Energy Group, LLC; CT Weatherproof Insulation, LLC; Steven C. Osuch; Energy ESC, LLP; Jonathan Casiano; and Bright Solutions, LLC (collectively, "Appellants").

EDCs, Eversource and The United Illuminating Company, which serve approximately 1.5 million customers. There are seven municipal utilities, which serve approximately 125,000 customers.

The Public Utilities Regulatory Authority ("PURA") regulates the rates and services of the EDCs through the approval of "tariffs." Each EDC operates pursuant to these tariffs, which set forth "rate schedules[,] . . . terms of service, rules and regulations of service, and standard template agreements the EDCs use in operating their electric distribution systems." J. App. 99. Individual customers then enter into written contracts with the EDCs, in which the customers agree to pay PURA-approved rates in exchange for electric service.

In 1998, the Connecticut General Assembly passed Public Act 98-28, An Act Concerning Electric Restructuring (the "1998 Act"), to encourage EDCs to restructure their power generation assets to favor more environmentally friendly energy production. The 1998 Act directed PURA to impose additional charges on electricity sold to EDC customers, which would be used to fund energy "conservation and load management programs." J. App. 92. The 1998 Act also established the Energy Funds, which include the Energy Conservation and Load Management Fund (the "C&LM Fund") and the Clean Energy Fund (the "CE

Fund") to be used to implement these programs. Because PURA only regulates EDCs, customers of municipal utilities do not pay these charges and are not entitled to take advantage the programs the charges are intended to support.

The C&LM Fund supports programs that provide financial incentives to Connecticut customers to reduce energy consumption. *See* Conn. Gen. Stat. § 16-245(m) (describing the purpose and management structure of the C&LM Fund).[2] The monies in the C&LM Fund are used to help businesses and residential customers access renewable energy programs and to "promote electric reliability and reduce peak power usage, create jobs, help businesses compete, and reduce harmful greenhouse gas emissions that contribute to global warming." J. App. 93. In paying the charges passed along in their electricity bills, EDC customers contribute approximately $156 million annually into the C&LM Fund.

The CE Fund is managed by the Connecticut Green Bank (the "Green Bank"), which is a "quasi-public" financial institution that "uses innovative financing techniques and market development tools" in partnerships with the private clean-energy sector. J. App. 94–95. The Green Bank may use CE Funds for approved projects that promote clean energy investments. *See* § 16-245n(c)

---

[2] Unless otherwise noted, all references to statutes are to the General Statutes of Connecticut.

(describing the purpose and management structure of the CE Fund). EDC customers pay approximately $27 million annually into the CE Fund.

Pursuant to sections 16-245m and 245n of the Connecticut General Statutes, PURA approves three charges for the Energy Funds: two charges to support the C&LM Fund and one charge to support the CE Fund. PURA incorporates these charges into the approved rates in the tariffs. In turn, the EDCs pass on these charges to their customers. On customer bills, Eversource labels the three charges as the "Conservation Charge," "Conservation Adjustment Mechanism," and "Renewable Energy." The United Illuminating Company groups the charges as a "Combined Public Benefits Charge," which includes charges for the "Conservation and Load Management Program" and "Renewable Energy Investment," as well as a "Systems Benefit Charge" that is not at issue in this case.

In 2017, the Legislature passed, and Governor Malloy signed, Public Act 17-2 (the "2017 Act"), an emergency state budget act. The 2017 Act transferred $63.5 million from the C&LM Fund and $14 million from the CE Fund (a total of $77.5 million) per year to the General Fund for fiscal years 2018 and 2019. On May 15, 2018, Governor Malloy signed Public Act 18-81 (with the 2017 Act, collectively referred to as "the Act"), which reduced the FY 2019 transfer from the C&LM Fund

6

by $10 million (from $63.5 to $53.5 million). "The State actually implemented the transfers by directing the EDCs and the Connecticut Green Bank to transfer the funds to the State Treasurer for deposit into the General Fund of the State of Connecticut . . . . " J. App. 111. The FY 2018 and 2019 transfers occurred in June 2018 and 2019, respectively.

## II. Proceedings Below

In May 2018, Appellants, a group of individuals, energy efficiency business, and nonprofit organizations—all electricity ratepayers and EDC customers—sued then-Governor Malloy, then-Treasurer Nappier, and Comptroller Lembo in their official capacities, claiming that the Act violates the Contract and Equal Protection Clauses of the United States Constitution. Appellants argue that the Act violates the Contract Clause because it interferes with the PURA-approved tariffs, which are incorporated into the service agreement between the EDCs and their customers. According to this theory, the payment of the tariff rates gives EDC customers a vested right to receive the energy efficiency services and clean energy investments that the charges were collected to support (as set forth in the tariffs). Transferring money from the Energy Funds to the General Fund reduces the funding for green energy initiatives and programs for EDC customers. In addition,

7

Appellants assert that the Act violates the Equal Protection Clause because, by transferring money from the Energy Fund to the General Fund, the Act taxes EDC customers and not municipal utility customers. The Complaint also includes several state law claims that are not at issue here.

Both parties moved for summary judgment. The district court granted Appellees' motion as to the federal claims and declined to exercise supplemental jurisdiction over the state law claims. Regarding the Contract Clause claim, the court concluded that the Act does not interfere with any contractual relationship between Appellants and the EDCs because their contracts do not grant Appellants the right to control how money in the Energy Funds is spent. The court noted that language in the tariff explaining the purpose of the Energy Funds was "purely descriptive" and "does not create any contractual obligation flowing to the plaintiffs from the EDCs." *Colon de Mejias v. Malloy*, 353 F. Supp. 3d 162, 173–74 (D. Conn. 2018). It observed that while customers may have had the expectation that the charges assessed for the Energy Funds could only be spent on energy efficiency and clean energy initiatives, the tariffs provide no legal right to enforce this expectation. *Id.* at 174.

Regarding the Equal Protection claim, the court granted Appellees' motion for summary judgment on jurisdictional grounds. First, it ruled that the Act was not a tax. *Id.* at 177–78. It reasoned that the Act did not raise revenue directly but instead reallocated money already collected. *Id.* at 178. In addition, the court determined that Appellants had no property interest in the Energy Funds and, therefore, that the Act did not transfer property from Appellants to the State. The court concluded that Appellants challenged only the government's decision regarding how to spend the money, a challenge that is barred by the taxpayer standing doctrine. *Id.* at 179. The court declined to extend the narrow exception to the doctrine for potential Establishment Clause violations. *Flast v. Cohen*, 392 U.S. 83, 103 (1968).

Appellants timely appealed from the entry of judgment.

## DISCUSSION

### I. Contract Clause Claim

"Our review of a district court's grant of summary judgment is *de novo*." *Globecon Grp., LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). Accordingly, "[c]ontract interpretation as a question of law is . . . reviewed *de novo* on appeal." *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d Cir. 2007).

Appellants first argue that the district court erred in dismissing their Contract Clause claim because the Act impairs their contractual rights to have the Energy Funds spent on conservation and clean energy programs. The Contract Clause of the United States Constitution provides: "No State shall . . . pass any . . . Law . . . impairing the Obligation of Contracts." U.S. Const. art I. § 10, cl. 1. "[T]he general purpose of the Clause [is] clear: to encourage trade and credit by promoting confidence in the stability of contractual obligations. Nevertheless, a State 'continues to possess authority to safeguard the vital interests of its people . . . .'" *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 15 (1977) (quoting *Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 434–35 (1934)). Therefore, "it is well settled that the prohibition against impairing the obligation of contracts is not to be read literally." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 502 (1987). Rather, "we must respect the wide discretion on the part of the legislature in determining what is and what is not necessary" to safeguard the welfare of its citizens. *U.S. Tr. Co. of N.Y.*, 431 U.S. at 16 (internal quotation marks and citation omitted).

Applying these principles, the threshold inquiry in a Contract Clause analysis is "whether the change in state law has operated as a substantial

10

impairment of a contractual relationship." *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992) (internal quotation marks and citation omitted). Here, we hold that no contractual right exists. We thus need not consider the next step of the inquiry—the nature of the impairment.

Federal courts look to both state and federal law to determine whether a contract exists and, if it does, whether the Contract Clause protects the agreement. *Pineman v. Oechslin*, 637 F.2d 601, 604 (2d Cir. 1981). State law determines whether an agreement is an enforceable contract, but federal law ultimately resolves whether the agreement is protected by the Contract Clause. *Id.; see also Gen. Motors Corp.*, 503 U.S. at 187 ("We accord respectful consideration and great weight to the views of the State's highest court, though ultimately we are bound to decide for ourselves whether a contract was made." (internal quotation marks omitted)).

Here, both parties agree that under Connecticut law contracts exist between EDCs and customers in the form of the service agreements which include the PURA-approved tariffs. The parties disagree about whether the contracts give Appellants "the right to prevent or limit [transfers] from the Energy Funds to the General Fund." *Colon de Mejias*, 353 F. Supp. 3d at 173 (citing *Keystone Bituminous Coal Ass'n*, 480 U.S. at 504). As a preliminary matter we conclude that the

11

Connecticut Legislature, through the enactment of sections 16-245m and 245n, did not contractually bind the State to spend the money in accordance with the statutes, incorporated by reference in the service agreements.

Absent a legislature's clear intention to bind itself contractually, we presume that "a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." *Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 466 (1985) (quoting *Dodge v. Bd. of Educ.*, 302 U.S. 74, 79 (1937)). In determining whether a legislature created a contractual agreement through a statute, courts first look to the language of the statute. *Id.* For example, the Supreme Court has found evidence of a contractual agreement created by statute when the statute defined the contract's terms, described "the making and canceling" of contracts, and used the word "contract" more than twenty times across its various sections. *Indiana ex rel. Anderson v. Brand*, 303 U.S. 94, 105 (1938).

Here, sections 16-245m and 245n govern the assessment of charges and the use of the money once the EDCs deposit it into the Energy Funds. The statutes provide that PURA "shall" assess the charges. §§ 16-245m(b) and 245n(b). Section 16-245m(b) provides that the EDCs "shall establish" a C&LM Fund, and section

16-245m(d)(1) provides that management plans shall be submitted to "implement cost-effective energy conservation programs and market transformation initiatives." Section 16-245n(c) directs the Green Bank to expend money to "promote investment in clean energy." Neither statute, however, contains language demonstrating a clear intent to bind the State contractually to those legislated objectives.

Unlike in *Indiana ex rel. Anderson*, the statutes here do not reference contracts or an intent to contract. 303 U.S. at 105. Without more, the statutory language does not overcome the "well-established presumption . . . that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state[,] . . . . [which] are inherently subject to revision and repeal." *Nat'l R.R.*, 470 U.S. at 466. Finding no explicit language to bind the Legislature, we must view the decision to amend sections 16-245m and 245n to transfer money from the Energy Funds to the General Fund as a change in legislative policy. Therefore, we agree with the district court that the relevant statutes cannot form the basis for Appellants' Contract Cause claim.

Appellants argue that, even if the state is not bound by the contract, the plain language of the service contract—specifically the "Explanation of Charges"

section—expressly guarantees that the charges for the Energy Funds are "*only* to fund programs" that benefit energy conservation and market transformation initiatives, and that any other interpretation produces an absurd result rendering other terms of the service contract unenforceable. Appellants' Br. at 22–23.

Appellants' proposed interpretation misunderstands the precise right at issue. The service contract between the EDCs and customers is limited in scope to providing electricity in exchange for payment of PURA-approved charges. The rate an EDC may charge is governed by the service contract, which includes the language of the authorizing tariffs. The services contract does not give Appellants the legal right to control the expenditure of funds collected because those expenditures are governed by statutes, which are subject to change by the Legislature. *Cf. Stoneridge Apts., Co. v. Lindsay*, 303 F. Supp. 677, 679 (S.D.N.Y. 1969) ("The [Contract Clause] is clearly intended to protect benefits and rights of a party under a contract and not to interfere with legislation which merely relates to the subject matter of the contract.").

Furthermore, there is nothing in the language of the tariffs that explicitly limits how money is to be spent once deposited into an Energy Fund. *See Nat'l R.R. Passenger Corp.*, 470 U.S. at 465-66 ("[A]bsent some clear indication that the

legislature intends to bind itself contractually, the presumption is that a law . . . merely declares a policy to be pursued until the legislature shall ordain otherwise." (internal quotation marks and citation omitted)). The Explanation of Charges section invoked by Appellants does not contain limiting language regarding the use of the collected funds. The express language of the tariffs, therefore, does not grant Appellants the right to control transfers from the Energy Funds to the General Fund.

Nor does the EDC contract's incorporation by reference of the PURA decisions give Appellants a right to prevent or limit transfer of money from the Energy Funds. These PURA decisions recognize that PURA "performs a limited role[,] . . . which consists primarily of ensuring funding for the [Energy Funds]." J. App. 213.  PURA's role is to approve the tariffs that govern the collection of the charges by the EDCs, while it is the statutes that govern the use of the monies once the EDCs deposit it into the Energy Funds. Incorporating the language of the statutes and the PURA decisions by reference, therefore, does not create a right for Appellants to control transfers from the Energy Funds.

Finally, Appellants argue that the Act violates the "filed rate doctrine" by removing money from the Energy Funds without modifying the existing tariffs.

Under the filed rate doctrine, regulated entities must adhere to the rate established by the appropriate regulatory agency. § 16-19(a); *see Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 127 (1990); *see also Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 576 (1981) ("Under [the filed rate] doctrine, no regulated seller is legally entitled to collect a rate in excess of the one filed with the [regulatory] [c]ommission for a particular period."). The doctrine also establishes that when the entity adheres to this established rate, ratepayers may not challenge these approved rates in court. *See Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994) ("Simply stated, the doctrine holds that any 'filed rate'—that is, one approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceedings brought by ratepayers.").

Here, Appellants contend that the term "rate" applies not only to the rate schedule but also to the entire tariff. Under this interpretation, Appellants claim that they had an expectation that the collected funds would be used in accordance with sections 16-245m and 245n until a new rate and use was approved by PURA. We disagree. The filed rate doctrine guarantees that a tariff's rate schedules conform to relevant regulations to prevent price discrimination. *Maislin Indus.*, 497 U.S. at 126. The rates here remain unaltered, and there is no requirement for PURA

to approve new tariffs that conform to the Act because, as discussed above, the express terms of the tariffs do not include language limiting the use of monies deposited in the Energy Funds.

For the foregoing reasons, we hold that Appellants do not have a contractual right to control transfers from the Energy Funds. Consequently, Appellants have failed to plead a violation of the Contract Clause.

## II. Equal Protection Claim

Appellants also argue that the Act assesses a tax on EDC customers but not on municipal utilities customers in violation of the Equal Protection Clause. Under the "taxpayer-standing doctrine," taxpayers generally have standing to challenge the *imposition of taxes* but not tax revenue *expenditures*. *See In re U.S. Catholic Conference*, 885 F.2d 1020, 1027 (2d Cir. 1989). A tax is "[a] charge, usu[ally] monetary, imposed by the government on persons, entities, transactions, or property to yield public revenue." *Tax*, *Black's Law Dictionary* (11th ed. 2019); *see also Nolte v. Hudson Navigation Co.*, 8 F.2d 859, 863 (2d Cir. 1925) (defining a tax as "an impost levied by authority of the government upon its citizens or subjects for the support of the state"). As the district court noted, although the nature and context of the payment may vary, a central element of the definition is the transfer

of property from citizens to their government. *Colon de Mejias*, 353 F. Supp. 3d at 177. In order for the Act to be a tax, therefore, Appellants must have a property interest in the Energy Funds that were reallocated to the General Fund. We turn to an examination of that issue.

Whether a litigant has a "property interest" is a question of state law. *See, e.g.*, *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Under Connecticut law, property interests require "a legitimate claim of entitlement," *Honulik v. Town of Greenwich*, 293 Conn. 698, 723 (2009), such as "(1) the right to use the property; (2) the right to earn income from the property and to contract over its terms with other individuals; and (3) the right to dispose of, or transfer, ownership rights permanently to another party," *A. Gallo & Co. v. Comm'r of Envtl. Prot.*, 309 Conn. 810, 838 (2013) (internal citations omitted).

Appellants have no such claim of entitlement to the monies in the Energy Funds. Rather, sections 16-245m and 16-245n provide for government oversight and control over those Energy Funds. The authority to approve expenditures from the C&LM Fund is vested in the Energy Conservation Management Board and in the Commissioner of Energy and Environmental Protection. *See* § 16-245m(d)(1). Similar authority with respect to the CE Fund is vested in the Green Bank. *See* § 16-

245n(c). Appellants have no right to control or use the money in the Energy Funds. *See A. Gallo*, 309 Conn. at 838.

Appellants' interest here is at most a "unilateral expectation" that the Energy Funds will be spent on conservation and green energy programs—not a clear entitlement to have the funds expended in that manner. *Bd. of Regents of State Colls.*, 408 U.S. at 577. Accordingly, as Appellants have no property interest in the funds, their reliance on *Energy Nuclear Vermont Yankee, LLC v. Shumlin* is misplaced. 737 F.3d 228, 228–231 (2d Cir. 2013).

In sum, because the transfer of previously collected revenue from the Energy Funds to the General Fund is not a transfer of Appellants' property to the state, it cannot constitute a tax. At its core, Appellants' argument is that funds previously collected for green energy and conservation initiatives will now be *expended* for another use. But taxpayers do not have standing to challenge such expenditures. *In re U.S. Catholic Conference*, 885 F.2d at 1027.[3] We therefore hold

---

[3] Appellants do not argue for, and we do not apply, an exception to the taxpayer-standing doctrine as we do for challenges to government expenditures that implicate the Establishment and Free Exercise Clauses of the First Amendment. *See Flast*, 392 U.S. at 103. Policy judgments, like allocating funds in a budget, are better left to legislatures, and the Supreme Court has yet to expand *Flast*'s narrow exception to respect "the proper— and properly limited—role of the courts in a democratic society." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (internal citation and quotation marks omitted); *see also id*. at 445–46 ("[B]ecause state budgets frequently contain an array of tax and spending

that Appellants have no standing to proceed with their Equal Protection claim and

affirm the judgment of the district court.

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment is

**AFFIRMED**.

---

provisions, ... affording state taxpayers standing to press such challenges simply because [of] their tax burden ... would interpose the federal courts as virtually continuing monitors of the wisdom and soundness of state fiscal administration, contrary to the more modest role Article III envisions for federal courts." (internal quotation marks omitted)).